14347

BAYNHAM v. STATE HIGHWAY DEPARTMENT OF SOUTH
CAROLINA

(187 S. E., 528)

436

Before SHIPP, J., Aiken, November, 1934.

*Messrs. John M. Daniels, Attorney-General, J. Ivey Humphrey and M. J. Hough, Assistant Attorneys General, Willcox, Hardee & Wallace* and *John E. Stansfield,* for appellant,

*Messrs. J. Nelson Frierson* and *Williams & Busbee,* for respondent,

August 27, 1936.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This is an action for damages. The complaint alleged, among other things, that the defendant is authorized by statute to construct and to keep in repair certain highways of the State, among them No. 1, extending from Aiken to Augusta, and No. 25, leading through North Augusta, to and across the Savannah River; that the plaintiff, during or prior to 1914, established a pottery manufacturing plant (a two-story brick building), upon the lowlands lying between the river and the higher lands upon which North Augusta is located, the products being manufactured from clay dug from pits located on Baynham's premises near the plant; that in 1927 the plaintiff also erected, near the same point, a brick gasoline filling station and an auto repair shop, all of these buildings being southeast of and adjacent to highway No. 25 and about a mile northwest from highway No. 1; and that the lowlands upon which the plant, filling station, and pits were located, had been subject, during the years that plaintiff owned the property, to occasional overflows from the waters of the Savannah River, after they had risen to approximately a 33-foot level at the City of Augusta. It was also alleged that in 1928 the defendant reconstructed that part of Highway No. 1 which passes through the lowlands, by filling in and placing on top of it a solid embankment, many feet higher than the level of the original roadbed, without providing sufficient openings or sluiceways through which the flood waters might pass; and that thereafter, in August of the same year, a flood occurred in the Savannah,

which caused its waters to reach the stage of approximately 40.4 feet at the City of Augusta, inundating defendant's manufacturing plant and filling station and otherwise doing damage to his property.

It was further alleged that the roadbed of No. 25, prior to August, 1929, was only slightly elevated above the level of the lowlands through which it passed, and that the overflow flood waters of the river "had theretofore been accustomed to cut a channel or pathway across and through said low-lying roadway as it then existed * * * at a point about half way between the plaintiff's pottery manufacturing plant, on the one side, and the North Augusta heights on the other side"; but that the defendant, in the summer of 1929, began the reconstruction of this highway and raised it for a distance of seven or eight hundred feet, at approximately a 6 per cent. grade from near the pottery plant to where it crossed over the tracks of the Georgia-Florida Railroad Company, to a height at the crossing of about 30 feet above the general level of the roadbed, the fill being constructed as a solid embankment without any open trestle work or sluiceways through which the flood waters of the Savannah might pass; that the channel or pathway was thereby narrowed, the elevation of the flood waters caused to be raised and their velocity increased, and the overflow waters thereby deflected from their normal course; that the defendant knew, or should have known, of the effect of the changes resorted to in the construction of the highways named, and in the performance of the work was negligent, such negligence resulting in damage to plaintiff's property which otherwise would not have occurred; that subsequent to the reconstruction and repair of the roadbed of No. 25, namely, in September and October of 1929, there was another flood in the Savannah River, the waters reaching the high stage of over 45 feet at Augusta; that the manufacturing plant and premises of the plaintiff, as a result of the increased height, velocity, and deflected current of the flood waters, caused and occasioned by the conduct of the defend-

ant in the building and maintaining a solid embankment or dam on Highway 25, were inundated and all of his property named and described were destroyed; and "that the acts of the defendant, as above set forth, constituted a taking of the above-described private property of the plaintiff by the defendant, a political subdivision of the State of South Carolina, for public uses and purposes, without just compensation being made therefore; and deprived the plaintiff of his said property without due process of law; in violation of the provisions of the Constitution of South Carolina (Article 1, § 5 and §17), and of the Constitution of the United States (Amendment 14, § 1), which provide that private property shall not be taken for a public use without just compensation being made therfeor, and that no State shall deprive any person of his property without due process of law."

The defendant, answering the complaint, admitted that the lowlands along the Savannah River had been subject to overflow by flood waters when the river was up. It also admitted that it was charged with the duty of building and of keeping in repair the two highways named, but specifically denied that it had been negligent in their construction as alleged. We quote as follows: "That this defendant admits that during the years 1928 and 1929, this defendant began the construction and has made considerable improvement on said highways, and admits that since the commencement of said work there have been unusual floods in the Savannah River caused by the unusual and excessive amount of rainfall, so much so that the Savannah River overflowed its banks and did great damage to adjacent property all along the said river, and caused great damage to the highways and bridges over and along the said river; that flood waters damaged the highways and bridges in the State Highway system to the extent of many millions of dollars, but this defendant specifically denies that it has at any time caused any flood in the Savannah River or elsewhere, or contributed thereto, and, to the contrary, the defendant alleges that the said floods were caused by the unusual amount of rainfall,

causing numerous streams to overflow their banks, and especially the Savannah River, all of which is and was well known to the plaintiff herein, and any damage which may have been sustained by this plaintiff was due to his own negligence in not building and constructing his plants so as to withstand said floods without injury; and to the great amount of rainfall, which was an act of God, and the unusual flood waters caused thereby, and by other things over which this defendant had no power or control, and this defendant specifically denies that it has, by the construction of said highways, or that the said highways have caused the floods, or in any way damaged the plaintiff's property, or taken any part thereof, and if there were any negligence on the part of any person which contributed to the damage which plaintiff alleges he has sustained, it was plaintiff's own negligence in building his plant, filling station and repair shop in the lowlands, knowing that the same were subject to be overflowed, without properly providing for such floods and high water."

On trial of the case, the jury found for the plaintiff $15,-000.00, after motions for a nonsuit and for a directed verdict, duly made, had been refused by the Court. Later, a new trial was also denied, and from judgment entered this appeal is taken.

There are twenty-nine exceptions, with numerous subdivisions; but it is agreed that the issues presented are comparatively few. In fact, while counsel for appellant submit and argue eight propositions, we think, adopting in the main their statement, that answers to the following questions will dispose of the appeal: (1) Did the trial Judge commit error in refusing to direct a verdict for the defendant on the ground that there was a total absence of proof of such taking of private property for a public use, within the purview of the constitutional provision, as to entitle the plaintiff to compensation? (2) Did he err in his charge to the jury? (3) In admitting certain testimony? (4) In refusing to

grant a new trial on the ground that the verdict was excessive?

First. The law applicable to the question here involved is well settled in this jurisdiction. We do not deem it necessary, therefore, to restate it or to discuss it at length. See *Chick Springs Water Co. v. State Highway Department*, 159 S. C., 481, 157 S. E., 842, 850, and the many authorities cited. The following from 10 R. C. L., 70, was there quoted with approval; it being pointed out that our own cases had been decided upon the principle stated: "Covering Land with Water or Earth.—There may be a taking of property in the constitutional sense although there has been no actual entry within its bounds and no artificial structure has been erected upon it. When a public agency acting under authority of statute uses land which it has lawfully acquired for public purposes in such a way that neighboring real estate, belonging to a private owner, is actually invaded by superinduced additions of water, earth, sand or other material so as effectually to destroy or impair its usefulness, there is a taking within the meaning of the constitution."

The Court also held, following its former decisions, that the provision of the Constitution here invoked, Section 17 of Article 1, is self-executing, and that an action at law would lie to recover just compensation for private property taken for public use, in advance of legislation providing therefor; and stated that the authorities were in agreement "that the flooding and injuring of property by the negligent impounding of a natural water course is a 'taking' under the constitutional provision." But in the more recent case of *Sheriff v. City of Easley*, 178 S. C., 504, 183 S. E., 311, 316, where the issue of negligence on the part of the defendant in the alleged taking by it was fairly presented by the appeal, the Court, in a strong opinion by Mr. Justice Baker, stated the following principle: "We hold that in an action against a municipal corporation under Article 1, § 17, of the Constitution, for the taking of private property for

public use without compensation, it is not necessary to allege or offer proof that such municipal corporation has negligently established, maintained, or operated that which has caused damages amounting to a taking, and that if there has been a taking without compensation, and a denial of the right of compensation, it is immaterial if the taking was due to the negligence of such municipal corporation; otherwise there could easily be cases of a taking without compensation, and the one whose property has been taken would be without remedy or redress if such municipal corporation was not guilty of negligence and denied the right of compensation."

And this rule applies, not only in actions against municipal corporations, but in actions against all political subdivisions of the State, including the State Highway Department. In *Chick Springs Water Company v. State Highway Dept., supra,* it was said: "No valid distinction can be drawn between cities, counties, and other political subdivisions, referred to in the *Faust* [117 S. C., 251, 109 S. E., 151], and other cases, on the one hand, and the State Highway Department, on the other. All are agencies of the State, and all derive their immunity from the same source, the State, and upon the ground that, being agencies of the State, they are in effect the State itself. Counties, cities, and other political subdivisions are held liable where they take property, not upon the ground that they are authorized by statute to be sued, but because of the constitutional provision requiring compensation to be made for such taking."

With these principles in mind, we turn to an examination of the testimony. It will be noted that the plaintiff is not asking for damages, and the jury was so charged, on account of the August, 1928, flood, but for damages done only by the September and October floods of 1929.

We have read with care the voluminous record. There is no dispute as to the ownership and location of the property in question, or as to the location of the highways on account

of the reconstruction of which by the defendant the plaintiff claims to have been damaged. Much of the testimony had to do with the flow of the waters, during floods which had occurred in the Savannah River at different times, across and by the City of Augusta and over the bottom lands through which the two highways were constructed, the height and volume of the waters during these floods, and their velocity, etc., under the circumstances testified to.

The plaintiff stated, as a witness on his own behalf, that his buildings and clay pits were 600 feet or more from the North Augusta heights, but that the land was considerably higher where he built his pottery plant than it was up nearer North Augusta, and that the flood waters would reach about a 32-foot level at Augusta before they came into his automobile shop; that at the time of a flood, because of this lay of the land, when the waters left the regular channel of the river, they would go into the lowlands toward the hill (which is to the north of the river up past plaintiff's buildings and near North Augusta), where the flood waters had washed out a regular channel and where they flowed the swiftest; that the flood waters of 1928 (which reached a height of 40.3 feet and had a discharge of 226,000 cubic feet per second), went over the top of his filling station, and while there was a little current there, it was not enough to be dangerous. He further stated that Highway No. 25 crossed, at that time, close up against the bluff on the North Augusta side, the tracks of the Georgia-Florida railroad; but after the 1928 flood, the defendant, desiring to take this highway off the grade, constructed a bridge over the railroad high enough to permit trains to pass under it; that also, in the year 1929, it built an embankment or fill on No. 25 high enough to cross over the railroad at the bridge, a height there above the level of the original roadbed of at least 30 feet; that from this point the embankment was constructed, at a certain grade, down to and in front of the plaintiff's pottery plant, at which place it was perhaps a foot or two in height,

the ground in front of the buildings having been theretofore almost level. He also testified that the highest part of this fill crossed the lowest part of the regular or main flood channel, which the witness stated had been made by previous flood waters and along which, during a flood, such waters would first flow; that this embankment, constructed without culverts or sluiceways through which the flood waters might pass, dammed such waters back and up, the highest part of the fill being in the lowest part of the floodway; and that, in consequence thereof, the current of the waters, in the flood of 1929, was entirely changed; that the waters, instead of following the former channel over next to the hill, came down with great force and velocity against the upper side of the embankment and were deflected around the end of the dam in front of the pottery building, their swiftness and pressure being so great as to sweep away several hundred feet of the fill; that the current, thus created and turned upon the plaintiff's property by the manner of the construction of such dam, was so strong that a boat could not operate there, and the pottery building, with some machinery, which was in the direct path of this newly created floodway, was completely washed away, as were the filling station and the automobile shop; and that the plaintiff's clay pits were filled waist deep with sand and gravel, which came from the fill erected by the defendant.

J. T. Faulkner testified that when flood waters came out of the river channel, their regular flow was along the hill next to the bluff, but that the fill dammed up this entire natural channel, the highest part of the embankment crossing the lowest part of the ground; that "in previous floods, and in that flood, the water left the river up there opposite the King Mill, and there is a little stream that goes into the river up there, and that valley comes on down to the foot hill of North Augusta, and of course, this fill acted as a dam and created a pond on the upper side of the fill, and then when that filled up, and instead of having eight hundred or one thousand feet through the fill to make its escape, it

was impounded by the fill, and the only chance for it to escape was in front of the Baynham pottery building and that created a sluice, and the Industrial Lumber Company buildings blocked the water on the upper side, and the impounded water created a sluice in front of Mr. Baynham's pottery building, and it moved out the whole thing, and I have never seen any such flood gates as that was or anything to compare with it. The fill opposite the filling station was higher than the filling station itself, and that protected the filling station until the pottery building collapsed, and then that sluice struck the filling station in the face, and it collapsed." This witness also stated that there were other brick buildings along this highway in the same neighborhood which were not destroyed by the floods of 1928 and of 1929.

Several other witnesses for the plaintiff testified very much to the same effect. They stated, in substance, that during the flood of August, 1928, a person could run his boat by the plaintiff's property up Georgia Avenue toward the North Augusta bridge, as there was little or no current there to carry you downstream; but that in the flood of September-October, 1929, this could not be done with safety because the current at that point was too swift; that the fill dammed up the main waterway and turned most of the current into a new narrow channel along the embankment; and that the end of the dam was in front of the pottery plant and the swiftest part of the current ran straight against and across it.

Data contained in the record show that the flood waters of September 27, 1929, reached a gauge height of 46.3 feet and had a cubic flowage of 343,000 feet per second, while the waters of October 3, 1929, reached a gauge height of 45.1 feet and had a discharge of 350,000 cubic feet per second. It will be noted that while the greater flood occurred in October, the other, the lesser one, was 1.2 feet higher. Mr. Williamson, defendant's engineer, testified that one of the factors which made this possible was that, in the September

flood, 1,300 feet of the solid fill of Highway No. 1, a mile or more to the south, was washed away.

There is much additional testimony contained in the record, but we deem a review of it unnecessary. We think that the evidence which we have pointed out, aside from that which we have not reviewed, required the submission of this question to the jury.

Counsel, however, argue with much earnestness that the great amount of rainfall and the flood waters of 1929 caused thereby were unusual and extraordinary, and that they alone caused the damage to or destruction of plaintiff's property; that the defendant, therefore, should not be held responsible in this instance, for none of its acts brought about the destruction and consequent injury complained of, but that such injuries were due entirely to unprecedented flood waters over which the appellant had no control. In short, it is contended that the pleaded defense of an "act of God," under the facts of the case, should be sustained.

The expression "act of God" has been variously defined. The principle, however, embodied in all the definitions is that "the act must be one occasioned exclusively by the violence of nature and all human agency is to be excluded from creating or entering into the cause of the mischief." 1 C. J., 1174. See, also, *Sloan v. J. G. White Engineering Co.,* 105 S. C., 226, 89 S. E., 564.

A flood of an unprecedented or extraordinary nature is an "act of God" in the legal sense, but such a flood is held not to be so where it could have been anticipated by ordinary foresight and prudence, or "where the injury complained of is due rather to the negligence or mismanagement of man than to the disturbance of the elements." 1 C. J. S., 1423 *et seq.*

Even conceding that the flood waters of 1929 which destroyed the property of the plaintiff were extraordinary or unprecedented, we think that the appellant's contention must nevertheless fail. In the first place,

defendant was well informed with regard to the many previous floods in the Savannah River, the respective heights reached by the flood waters, and the flowage of cubic feet per second at Augusta, as shown by the data which it put in evidence itself. It also had knowledge of the topography of the country, the history of heavy rainfalls at certain seasons, etc., and doubtless knew of the statement contained in the report of a United States civil engineer of June 14, 1929, of "the probability that larger floods than 400,000 second feet may occur * * *•" at that point. These facts, we think, under applicable principles of law, made a question for the jury as to whether the appellant could and should have anticipated, by the exercise of ordinary foresight and prudence, such floods as occurred in September-October, 1929; and whether it should have taken into consideration the probability of their occurrence, in the reconstruction of the highways named. In the second place, it was also for the jury to determine, under the testimony, whether or not the fill, as erected by the defendant on Highway No. 25, was not the real factor, or at least a participating one, in bringing about the damage to or destruction of plaintiff's property.

Second. The Court instructed the jury as follows: "Now, if they have done a lawful act, and did it in a proper manner, nobody can complain, but they have no right now to build a road so as to change the current of a natural stream and injure the rights of property owners on either side of the road. Water ought to run in the way that nature designed it to run, and any one that interfers with the natural flow of water so as to collect it and turn it on other people—that would be a negligent act and they have no right to do that."

" * * * and so where a Highway Department negligently throws water upon the land of another above the road, or if by increasing the current they throw water on it below it, they would be liable."

The appellant complains that this was a charge on the facts in violation of Section 26 of Article 5 of the Constitution, in that it "conveyed to the jury the opinion of the Court that the defendant had ponded water and hurled it upon the property with destructive effect"; and also "in that the facts assumed by the Judge in such charge were merely an embodiment of the contention of the plaintiff."

In *Sheriff v. City of Easley, supra,* it is said: "It was undoubtedly error to hold, at the time of passing upon the motion for a nonsuit, and in charging the jury, that the case was predicated upon negligence, and in making the test of liability the negligent establishment, maintenance, and operation of the septic tanks. But the error, instead of being harmful to appellant, was beneficial to it, and placed an unnecessary burden upon respondent to prove negligence."

It is argued, however, that if the Court should hold that negligence is not an element in this case—as we do hold—the instruction was still erroneous, because, in any event, "it impressed the jury with the idea that the defendant was liable for the injury to the property of Baynham."

We do not think so. That portion of the charge first above quoted occurs immediately after the Court's explanation to the jury of the rule concerning the obstruction of the natural flow of water and as to what is the rule of ordinary care and prudence which must be observed so as not to interfere with such flow, and should be read in connection therewith; the last above, about which the appellant complains, was given in connection with the charge that the impounding of water by one person and throwing it upon the lands of another, so as to destroy the use of his property, was a "taking in the sense of the law," and was merely intended as an illustration to make clear the Court's meaning. Immediately thereafter the jury was told that the facts were exclusively for them, and that the Judge was not allowed to say what he thought about the case. When the charge is read and considered as a whole, as it should be, we find no error as complained of.

The Court also told the jury: "Surface water is a common enemy and everybody has a right to fight it, but no one has a right to collect surface water in artificial channels and turn it loose on other people or back it up on other people, and so a Highway Department must use reasonable care in the construction of its roads."

The appellant contends that this charge was inapplicable; that there was no issue as to surface waters; and that such instructions, therefore, tended to confuse the jury and to lead them away from the real point in the case.

We quote what the Judge said just before and in immediate connection with that above set out: "One rule is that no one has a right to obstruct the natural flow of water. If they cross a water-way, they have a right to build across there, but they must take means not to interfere with the natural flow of water, and a person has no right to impound *even surface water.*" (Iitalics added.)

While the charge objected to, surface waters not being an issue in the case, might properly have been omitted, it did the appellant no harm. When read in connection with the context, it seems clear that the jury could not possibly have been confused or misled thereby. In addition, if counsel conceived that the Court was misstating the issue, they should have directed attention to the mistake.

Third. The Court allowed, over defendant's objection, the following testimony of the plaintiff:

"Q. Before that solid fill was built, and when your filling station was in this condition—did you ever have an opportunity to sell it? A. Yes, sir; several. At one time I was offered forty-five hundred dollars for it.

"Q. You were offered forty-five hundred dollars for it? A. Yes, sir; at one time."

The appellant argues that this testimony, being a mere offer to buy, was incompetent and inadmissible as proof of the market value of the property. The presiding Judge ruled that it was not the usual way to determine such value, but was "one way to get at it."

In *Sharp v. United States,* 191 U. S., 341, 24 S. Ct., 114, 115, 48 L. Ed., 211, a condemnation proceeding, where the question of value was directly presented, the Court had this to say with regard to the admissibility of such testimony:

"Oral and not binding offers are so easily made and refused in a mere passing conversation, and under circumstances involving no responsibility on either side, as to cast no light upon the question of value. It is frequently very difficult to show precisely the situation under which these offers were made. In our judgment they do not tend to show value, and they are unsatisfactory, easy of fabrication, and even dangerous in their character as evidence upon this subject. Especially is this the case when the offers are proved only by the party to whom they are alleged to have been made, and not by the party making them. There is no chance to cross-examine as to the circumstances of the party making the offer in regard to good faith, etc. Evidence of this character is entirely different from evidence as to the price offered and accepted or rejected for articles which have a known and ready sale in the market. The price at the stock exchange of shares of stock in corporations which are there offered for sale or dealt in is some evidence of the value of such shares. So evidence of prices current among dealers in those commodities which are the subject of frequent sales by them would also be proper to show value. This evidence is unlike that of offers to purchase real estate, and affords no ground for the admissibility of the latter.

"A reference to the authorities shows them to be almost unanimous against receiving evidence of this kind. Counsel have cited many cases on this subject and they are contained in the margin. Most of them are clearly against the admissibility of the evidence, while some, which at first sight might be regarded as exceptional, will be found upon closer examination to recognize the general rule as already stated."

In *Hine v. Manhattan R. Co.,* 132 N. Y., 477, 30 N. E., 985, 986, 15 L. R. A., 591, as to admission of testimony of

this sort, we find: "The evidence adduced in this case is objectionable, because it places before the Court or jury an absent person's declaration or opinion as to value, while depriving the adverse party of the benefit of cross examination. The highest value at which an offer, standing alone, can be estimated is that it represents the opinion of him who makes it as to the worth of the property. Nevertheless the assertion that he offered to part with his money might give to such hearsay opinion more weight with a jury than an opinion given by a witness before them, not thus supported. While, notwithstanding his opinion was backed by a promise to pay money, which was not enforceable, he may not have been competent, in a legal sense, to express an opinion on the subject. If he was, other reasons may have prompted the offer than an expectation of actually becoming the purchaser, or of obtaining it at its market value."

In *Town of Canton v. Harris,* 117 N. C., 10, 97 S. E., 748, 749, where the same question was considered, the Court said: "An unaccepted offer of this kind may be influenced by so many considerations entirely foreign to such an issue, and may put the opposing party at such disadvantage, affording him, as it does, no fair opportunity to either anticipate or combat it, that its reception as evidence has been very generally disapproved by the authorities on the subject." And further: "In jurisdictions where this is the prevailing rule, the rare instances in which the position is apparently departed from are chiefly cases of personal property or stocks having a recognized market value, and for reasons that are not usually present in the determination of land values. McKelvey on Evidence (2d Ed.) pp. 264, 265. Approving this as the general rule where the values of realty are concerned, we are of opinion that, on the facts presented, this evidence of a particular offer to purchase the Walker land is incompetent, and its reception must also be held for error."

See, also, 22 C. J., 179, 10 R. C. L., 956.

For the reasons stated by the authorities above cited, we are of opinion that plaintiff's testimony as to the offer received by him for his filling station, and which was allowed as some evidence of the value of that property, was clearly inadmissible. Counsel for the respondent say, however, that even if its admission was error, which they do not concede, such error was cured by other testimony admitted on the same point, namely, the market value of the filling station. The plaintiff stated that he did not accept the offer, because the station was "paying interest on a lot more, as I was getting seventy dollars a month rent for it." This testimony was competent, not only on the issue of the market value of that specific property, but also upon the question of the *bona fides* of the plaintiff's refusal to accept the offer made for it. J. T. Faulkner testified that he had been in the lumber business since 1907; that it was a part of his work to investigate almost daily the cost of materials being used in the erection of buildings; and that he guessed the plaintiff's filling station represented an actual cost of construction of $4,000.00 or $5,000.00. A witness, Belton Weeks, stated, without objection, that he and one A. R. Taylor tried to purchase the station from Baynham for $4,500.00, but that he would not accept the offer. All of this testimony was undisputed. And as is seen, it tended to establish the market value of the filling station at about $4,500.00—the amount of the offer testified to by the plaintiff. We are constrained to hold that the error complained of did the appellant no harm.

Fourth. The defendant offered no testimony as to the value of the property damaged or destroyed. It may be, nearly two years having elapsed before the action was brought, that it was handicapped in obtaining such evidence. We have already called attention to the testimony offered by plaintiff with regard to the value of the filling station. The witness Faulkner also testified that he had passed the pottery building almost every day for several years and had gone into it; that he had formed, in a general way, an estimate of its value in September and October, 1929;

that he "figured it around about twenty thousand dollars replacement cost," the cost of equipment not being considered by him as he had no idea of its value. The plaintiff himself testified as to the value of certain personal property destroyed, and also what it cost him to repair some of it that had been damaged by the flood. He also stated that he attempted to remove the gravel and rock from his clay pits, at a cost named, but it turned out that he had to abandon the pits and to buy his clay elsewhere for manufacturing purposes. While some of the evidence as to the value of appellant's property and the loss suffered by him was somewhat vague and unsatisfactory, considered as a whole we think it required the submission of these matters to the jury and tended to sustain their finding as reflected by their verdict. In any event, we cannot say that Judge Shipp abused his discretion in refusing to grant a new trial on the ground that the verdict was excessive.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate.