# Winchester Water Works Company v. Holliday et al.

(Decided December 4, 1931.)

JOUETT & METCALF for appellant.

D. L. PENDLETON for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Various farmers sued this water company for damages done to their farms by a flood of water cast upon them by the breaking of what is, in this record, referred to as a flash dam belonging to the water company. To save costs it was agreed that all of them might join in one action. They did so, all the cases were heard together, and judgments against the water company were recovered as follows:

Lewis Holliday, $240.
A. C. Clark, $182.50.
Elizabeth W. Quisenberry, $562.50.
Robert L. Quisenberry, $786.
C. N. Royalty, $696.

The water company has made a motion here for appeal from the first two of these judgments and has prosecuted, from the other three judgments, an appeal granted it by the trial court.

This court has no jurisdiction of the Clark judgment as it is less than $200, and that appeal is now dismissed. The other four judgments will be disposed of in one opinion.

The Winchester Water Works Company has its reservoir about 4½ miles from Winchester, consisting of two artificial lakes known as the Lower Lake and the Upper Lake. The Lower Lake is formed by the waters of Howard creek, across which is built a large concrete dam, consisting of a wing wall 112 feet in length on the west side and a similar wing wall 74 feet long on the east side. Between these wing walls is a concrete dam 150 feet long and 25 feet high. The top of this concrete dam is 3½ feet lower than the level of the wing walls, thus making a spillway between these wing walls of 150 feet in length and 3½ feet in height. The total length of this entire dam from the extreme end of each wing wall, or from "hill to hill" (including the 150 feet of concrete dam between the wing walls) is 336 feet. Without this spillway, and with a solid dam instead, more water would be confined in the reservoir during rainy seasons than needed; therefore, this spillway in the center of the dam allowed the surplus water to escape through it. The dam of the Lower Lake has been a permanent structure for more than thirty years, but in recent years the Lower Lake has been filling up to some extent and for the purpose of impounding or holding more water during dry seasons, the water company has been installing, each year since 1921 upon the 150 feet of spillway portion of the concrete dam, a temporary flashboard dam 150 feet long and 15 inches high made in 15 sections or panels, thus elevating the spillway dam temporarily 15 inches. If the water gets so high in the Lower Lake, while this flashboard dam is installed, as to flow over its top, sections of it in time will wash out. This flash dam washed out on June 29, 1928, and on July 13, 1928; which let the impounded waters in a body tear down the creek below with such force and violence that trees and rock fences, stone abutments, and an old rock dam, which had stood undisturbed for over a hundred years, were torn out and washed away, some of the large stones from this old

dam being scattered along down the creek for a mile below.

Mr. Attersall, the company's superintendent, admits, on cross-examination, that after the first installation, in 1921, of this flash dam, certain sections had washed out in April, 1923, June, 1926, July, 1926, twice in June, 1927, showing that as the years passed and the mud accumulated in the bottom of the reservoir this temporary structure became less able to stand the pressure, as it stood from 1921 to 1923 with only one break and from 1923 to 1925 with only one break, but it broke once in 1926, and twice in 1927, and this suit was for the two times it all went out in 1928.

The water company does not complain of the amounts of these recoveries, but insists the court erred (a) in not sustaining its motion for a directed verdict in its favor made at the close of the evidence for the plaintiffs and renewed at the close of all the evidence, and (b) in giving and refusing instructions.

The basis of its contention for a directed verdict is this, which is taken from the brief filed on its behalf: "In their petition plaintiffs stated, as a conclusion and description of the dam, that, 'it was too weak to stand the pressure of high water such as had occurred previously.' The proof shows that this flash board dam was installed with the expectation that it would go out under certain conditions. It was only a temporary structure and had gone out frequently, but never at any time because of its negligent or faulty construction or any negligence on the part of the Water Company. At the close of the case the evidence disclosed that not a particle of negligence had been shown or proven against the Water Company in the construction or maintenance of the flash board dam. Its character and construction was fully testified to by Mr. Attersall and others, and the 'Blue Print' of the plan and specifications from which it was built, prepared by Mr. Wheeler, Supervising Engineer, was introduced. No evidence was introduced to show that these plans and specifications were faulty in any respect or that the dam was not constructed in accordance with them. The evidence further revealed that the flash board dam was first installed in 1921, and so long as the water in the Lower Lake remained on a level with the top of the flash board dam the dam held, but when it got so high as to flow over its top, portions of this temporary

dam would wash out. This is what it was expected to do, and this had occurred on at least six different occasions since its installation."

In other words, if a man should set a gun on his premises so constructed as to go off at intervals, and it did go off as designed and killed a horse in the pasture of a neighbor, under the water company's idea of the law, the latter could not recover because the gun had gone off according to design. That cannot be the law.

The lands of Holliday et al. in this creek valley had upon them the servitude of receiving and enduring the effects of waters naturally gathering and flowing down this creek valley, but the Winchester Water Company as an upper proprietor had no right to gather and impound these waters and then suddenly let them loose upon the lands of these lower proprietors.

It is not a question of negligence. The sole question is: Did it do so? It admits that it did. Its liability for the damages resulting follows as a matter of law. See Lincoln Coal Co. v. Deaton, 229 Ky. 330, 17 S. W. (2d) 249; Steinke v. North Vernon Lumber Co., 190 Ky. 231, 227 S. W. 274; Ford Lumber & Mfg. Co. v. Clark, 68 S. W. 443, 24 Ky. Law Rep. 318; American Car & Foundry Co. v. Spears, 146 Ky. 736, 143 S. W. 377; 20 R. C. L., pp. 74, 75, 76, secs. 65, 66, 67; 27 R. C. L., p. 1151, sec. 79, p. 1194, sec. 111, p. 1099, sec. 35; 40 Cyc., pp. 647, 683.

Relative to the alleged error in giving and refusing instructions, we find no essential difference between the principal instruction given and the corresponding one offered by the water company, except the words italicized in this clause taken from the instruction given:

"Or that said flash board dam on either, or both, of the above said dates was so negligently constructed *as to be too weak to withstand the pressure of high water, such as could be reasonably anticipated by persons of ordinary experience and prudence to occur in Howard's Creek during the time it was used, and* that on June 29, 1928, and July 13, 1928, during a high stage of water in defendant's reservoir, said flash board dam gave way and was washed out."

The water company's complaint of the italicized words is rested upon the same view of the law as was

its motion for a directed verdict, which we have discussed above, and its objection to these words must abide our conclusion relative to its motion for a directed verdict.

The water company is not an insurer of the safety of its dam, but is required to use ordinary care in its maintenance. It cannot provide a device, with intention that it shall give way in time of flood and avoid injuries resulting to lower proprietors. Its position is well illustrated by this taken from 40 Cyc., p. 683, note 40: "If the owner cuts or breaks his own dam, in the midst of a violent storm, to save it from destruction, with the result that the flood waters destroy property below him, he cannot escape liability on the ground that he acted in self preservation and with no malicious intent." That is what the water company did, except that instead of going out and cutting its dam, it built it so that it would give way automatically.

To the student of this question we suggest the reading of the opinion of Lord Chancellor (Hugh McCalmont Cairs) and Lord Cranworth (concurring) adopted by the House of Lords in the famous English case of Rylands v. Fletcher, reported in 1 English Ruling Cases, p. 236, also reported in L. R., 1 Ex. 265; L. R., 3 H. L. 330 (s. c. 35 L. J. Ex. 154; 12 Jur. n. s. 603; 14 L. T. 523; 14. W. R. 799; 4 H. & C. 263; 37 L. J. Ex. 161; 19 L. T. 220), also the reading of Brennan Construction Co. v. Cumberland et al., 29 App. D. C. 554, 15 L. R. A. (N. S.) 535, and notes following, and City Water Power Co. v. City of Fergus Falls, 113 Minn. 33, 128 N. W. 817, 32 L. R. A. (N. S.) 59, Ann. Cas. 1912A 108.

The liability of the defendant here rests, not upon negligence, but upon its intentional doing of something it had no right to do (that is, the construction of a dam so built that it would give way in time of flood), by which a loss was imposed upon the plaintiffs.

"Every man may do as he chooses with his own property, provided he does not injure another's; but there is another rule as well established, which is, that a man must so use his own property as not to injure his neighbors. Angell on Water Courses, Sec. 336; Everett et al. v. Hydraulic Flume Tunnel Co., 23 Cal. 225; Kinney on Irrigation & Wtr. Rights (2d Ed.) p. 3075."

The water company tendered instructions defining "proximate cause," "act of God," and directing the

jury to find for the defendant if it believed from the evidence that unusual, extraordinary, or unprecedent rainfall contributed to or was the sole cause of the loss sustained by the plaintiffs. These were properly refused. See 27 R. C. L., pp. 1106 and 1107, sec. 40, from which this is taken:

"While it is the general rule that where rains are so unprecedented, and the flood caused thereby so extraordinary, that they are in legal contemplation the act of God, one obstructing a natural watercourse will not be held liable, it must appear, in order to give immunity under that rule, that the act of God is not only the proximate cause but the sole cause of the injury."

The rule is stated this way in 1 C. J., p. 1174, sec. 2:

"The principle embodied in all of the definitions is that the act must be one occasioned exclusively by the violence of nature and all human agency is to be excluded from creating or entering into the cause of the mischief. When the effect, the cause of which is to be considered, is found to be in part the result of the participation of man, whether it be from active intervention or neglect, or failure to act, the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God. Thus if a party is in default for not performing a duty or not anticipating a danger, or where his own negligence has contributed as the proximate cause of the injury complained of, he cannot avoid liability by claiming that it was caused by an act of God."

See Louisville & N. R. Co. v. Vandiver, 238 Ky. 846, 38 S. W. (2d) 965.

These rainfalls may have been unusual, but the water company had anticipated such and had so constructed its so-called flash dam that it would give way when they came, and it did; hence the water company must answer for the resulting damages to the lands of these lower proprietors.

The judgments are affirmed.