ROCKFORD PAPER MILLS, INC., *v.* CITY OF ROCKFORD.

1. WATERS AND WATERCOURSES—DAMS—NATURAL FLOW—NEGLI-
   GENCE—WEIGHT OF EVIDENCE.
   In nonjury action by lower dam owners against owner of dam
   two miles upstream in hilly country for damages due to alleged
   negligence in operation of upper dam in mid March after
   precipitation of 1.83 inches in course of two days preceding
   washout, finding of trial judge that defendant had not ma-
   terially lowered the water level of its 17.7-acre mill pond and
   that only the water coming downstream by natural flow into
   its pond was released through opening of some of its gates
   without negligence on the part of defendant whose own .dam
   was about to be overflowed *held,* not against the weight of the
   testimony.

2. SAME—DAMS—NEGLIGENCE—NATURAL FLOW.
   A lower riparian owner seeking damages from proprietor of a
   dam upstream for negligent operation thereof must show that
   injuries inflicted due to overflow of waters was by reason of
   the fact that more water was cast upon the lower owner's
   premises than would naturally and necessarily have been cast
   if defendant's dam had not been at its site and that defend-
   ant intentionally or negligently caused the injury.

3. SAME—DAMS.
   The proprietors of an upper dam are not insurers of the strength
   or. stability of a lower dam.

4. APPEAL AND ERROR—QUESTION FOR TRIER OF THE FACTS.
   The Supreme Court is not inclined to substitute its conclusion
   as to a question of fact for that of the trier of the facts where
   the facts are in such dispute that reasonable minds might differ
   on the result.

5. SAME—QUESTIONS REVIEWABLE.
   In nonjury action by lower dam owners against proprietor of
   upper dam where evidence sustained finding of trial court that

defendant was not negligent, question as to whether or not the weakened condition of plaintiffs' dam was the proximate cause of the washout is not discussed.

Appeal from Kent; Brown (William B.), J. Submitted January 10, 1945. (Docket No. 45, Calendar No. 42,861.) Decided April 9, 1945.

Case by Rockford Paper Mills, Inc., a corporation, and Herman Gumbin against City of Rockford, a municipal corporation, to recover damages for destruction of their dam by excessive water. Judgment for defendant. Plaintiffs appeal. Affirmed.

*McAllister & McAllister* and *Laurence W. Smith*, for plaintiffs.

*Thomas D. Anderson* and *Alexander, McCaslin, Cholette & Buchanan*, for defendant.

BUTZEL, J. Rockford Paper Mills, Inc., and Herman Gumbin, plaintiffs, were the owners of a mill, land and dam, situated on the Rogue river at Childsdale in Kent county, Michigan. Plaintiffs used the water from their dam in making paper products and also in generating power to operate their beater room. Their dam, due either to original construction or wear and tear or both, was not in good condition. Two miles above the dam on the same river was another dam belonging to the city of Rockford, defendant herein, and within its corporate limits. Defendant purchased its dam site and a dam in October, 1937, and thereupon built a new dam of more modern construction. It is in two sections forming a right angle with an island between them, which is used as a city park. Each section has nine gates, those on one side being from

6 to 18 feet wide, and on the other, 8 feet wide. Back of this dam is a large pond covering approximately 17.7 acres from which the water is drawn, purified, and distributed through the city water works. The head water level is about 19 feet, that of Childsdale 11 feet, so that there is a drop of about 8 feet from defendant's dam to that of plaintiffs'. It takes about 1 to 1½ hours for water from defendant's dam to raise the level at plaintiffs' dam. The source of the river is approximately 27 miles north of the city of Rockford. The river is narrow as it flows through a hilly countryside, and it rises very rapidly, particularly after a spring thaw.

On March 15, 1943, the winter in which there had been heavy snowfalls approached its end. Due to the breaking up of the ice and the melting of the snow, a very large volume of water came down the Rogue river. In addition to this, on March 15th and 16th, there was a rainfall of 1.83 inches, the heaviest recorded in the month of March at Grand Rapids, nearby, for many years. This was not as heavy as the rainfall of 2.21 inches on September 8, 1941, but at that time there was not the additional water from the melting snow and ice. One witness testified that about four miles upstream from the Rockford dam, the water had risen approximately six feet from the afternoon of March 15th up to 1:00 a.m. on March 16th. Another witness stated that he lived approximately 10 miles upstream from defendant's dam, that on the morning of March 16th the water had risen in the Rogue river so that it had overflowed its banks, flooded the cellar of his home, and that the water was the highest he had ever seen it though he had lived on the Rogue river for over 10 years. This untoward condition seriously alarmed both plaintiffs and defendant. Early

on the morning of March 16, 1943, plaintiff Gumbin and other agents of plaintiff corporation went to the city of Rockford and notified defendant's agents of their apprehension that the rising water would seriously damage plaintiffs' property. Defendant's agent stated that he would not let out any more water than he had to. Just how many of the gates were opened or closed was an issue of fact. Defendant was having its own difficulties with the onrush of the water. The water going over the west portion of the dam went south and over the east portion went west, thus causing a whirlpool which undermined the downstream side of the island between these two portions during the night, and water was gushing up. This was stopped with sandbags. Defendant was also apprehensive as to what would happen to its own dam because of the pressure of excess water.

The testimony sustains the finding of the trial judge that gates were closed, others were opened. He further found that during the period of several hours in which defendant was gradually opening the gates of the dam, there was no lowering of water in defendant's dam, and that the only water that went through was that which was coming down the stream. The judge stated in his opinion:

"The evidence clearly establishes the fact that at all times when the defendant's employees opened any of the gates in the Rockford city dam, the water in the pond above the dam [was?] at flood stage, practically to the top of the abutment, and on the verge of overflowing the defendant's dam. The evidence clearly establishes that at no time while any of these gates were opened was there a material lowering of the water in the defendant's pond above the dam. There is evidence that at one stage of the proceedings the water in the pond receded a

few inches on the bank, but the bank was sloping at an angle, and at the level of the water itself, would not be lowered more than a matter of 2 or 3 inches if lowered at all. The wind may shift the water level at times. The evidence also establishes that there was a tremendous flow of water coming down the Rogue river due to the melting snow and precipitation, and due to the natural terrain, and it clearly appears that the water which was let through the defendant's dam was only the amount of water which was coming down the river by natural flow, and there is no evidence in this case that at any time during the period involved there was any material lowering of the water impounded in defendant's pond above the dam."

He further found that there was no material lowering of the water in defendant's dam, and that the only water which was let through the dam was that coming down the river by natural flow. He stated:

"From the afternoon of March 15th, when the water in the river started to rise, until the early afternoon of March 16th, when plaintiffs' dam went out, the defendant had opened a net of six gates in its dam, having opened eight and closed two gates, and there was still a total of eight gates in both the east part of its dam and the west part of its dam, which had not been opened and which were in working order."

From plaintiffs' statement of facts, it might appear that defendant suddenly opened up almost all the gates of its dam and the sudden onrush of impounded waters caused a tremendous flowage so that plaintiffs' dam went out, its property was inundated with water and its machinery very badly damaged; thus causing damages, as plaintiffs claim, in the amount of $50,000. Plaintiffs' contentions are not borne out by the weight of the testimony.

The judge found no negligence whatsoever on the part of defendant, and further, the water that went past defendant's dam was the excess amount that came down the river. Ice also accumulated at defendant's dam and this was loosened up by defendant. Some distance below defendant's dam but above plaintiffs' dam, water and ice that had accumulated was held back for a time by a fallen tree alongside the farm owned by one Todd. The jam broke and additional water and ice thus also came down to plaintiffs' property. It would serve no purpose to detail all the testimony contained in a record of over 500 pages. We have gone through it with extreme care and we determine that the findings of the judge sitting without a jury are fully supported by the weight of the testimony. He rendered a judgment of no cause of action.

Plaintiffs' questions on appeal assume that defendant was guilty of negligence. Plaintiffs quote at great length partial excerpts from encyclopedic treatises on law. Defendant replies in kind, giving exact quotations that hold contrary to plaintiffs' contentions. These treatises are invaluable for research purposes and at times indispensable to a student of law. We have examined the cases referred to in the footnotes in the treatises and find the factual setup so different in each case that the citations are not applicable. The one case most favorable to plaintiffs is *Winchester Water Works Co.* v. *Holliday*, 241 Ky. 762 (45 S. W. [2d] 9), where some general language was used which is solely applicable to the particular facts. In that case the water was intentionally released without any regard to the rights of the proprietors below. In the present case the judge found that the waters that came down were the additional waters from the Rogue river. The law of Michigan is set forth in

*Taylor* v. *Indiana & Michigan Electric Co.,* 184 Mich. 578 (L. R. A. 1915 E, 294), wherein the court held that the damages must arise through the negligent operation of the dam. The court approved of the following instructions by the trial court:

"No matter how much damage plaintiff and his assignors may have suffered by reason of the overflow of water from the St. Joseph river from and after the 4th day of June, 1909, he and neither of them can recover in this action if the water for any reason so flowing upon and over their lands was not more than would naturally and necessarily have been cast upon their lands if there had been no dam at the place shown by the evidence. * * *

"In addition he must show, not only that he received an injury, but that the defendant, through some wilful and negligent act which a prudent man would not have done, caused the injury to the plaintiff and his assignors. * * *

"The defendant had a right to discharge water from its pond faster than it flowed in, so as to reduce the elevation of the pond and facilitate the business of the defendant, and it would not be liable therefor, unless such water was negligently discharged and at a time and in a manner that a man of ordinary judgment and discretion would not have caused such water to be discharged, having in mind the rights of owners of land below such dam."

This case, cited by both parties to the instant case, correctly states the law. The proprietors of the upper dam are not the insurers of the strength or stability of a lower dam. To hold them responsible, there must be negligence or some intention on their part to suddenly release impounded waters so that damage to the lower dam will follow. They cannot be held responsible for a superfluity of waters coming from a flood condition arising above their dam without any negligent act on their part.

In the last analysis, even if we were to assume the correctness of some of the testimony which plaintiffs claim sustains their contentions, nevertheless there is abundant testimony to the contrary. As was but recently held in *Flat Hots Co., Inc.,* v. *Peschke Packing Co.,* 301 Mich. 331, we are not inclined to substitute our conclusions as to a question of fact to that of the trier of facts where the facts are in such dispute that reasonable minds may differ as a result. Under the circumstances, we need not discuss other questions raised by appellees, including also the claim that the weakened condition of plaintiffs' dam was the proximate cause of the washout.

We find that the judge came to the correct conclusion. The judgment is affirmed, with costs to defendant.

STARR, C. J., and NORTH, WIEST, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.