**George P. BAKER et al., Plaintiffs,**

**v.**

**CITY OF ANN ARBOR, a Michigan Municipal corporation, Defendant.**

**Civ. A. No. 34320.**

United States District Court, E. D. Michigan, S. D.

March 13, 1974.

Richard W. Ryan, Burke, Ryan, Rennell, Foster & Hood, Ann Arbor, Mich., for plaintiffs.

Patrick E. Hackett, Gen. Atty., Detroit, Mich., for Penn Cent.

Peter A. Davis, Hooper, Hathaway, Fichera, Price & Davis, Ann Arbor, Mich., for defendant.

## OPINION AND ORDER

KAESS, Chief Judge.

Penn Central Transportation Company, through its Trustees, has brought suit to recover damages incurred on June 25, 1968, when approximately 1,100 feet of its mainline tracks in Washtenaw County were destroyed in a washout at the site of the Geddes Dam on the Huron River. The City of Ann Arbor had acquired the dam, along with three others, from the Detroit Edison Company in September, 1963. The Geddes Dam, built in 1918, employed two gates through which the water could flow. The gates were of the so-called "bear trap" design, and each gate consisted of two steel leaves hinged at the top to form an inverted "V". One of the leaves was buoyant and the gate was held in position by introducing water into the cavity formed by the inverted "V". The gate was lowered by evacuating the cavity and allowing the pressure of the upstream waters and the weight of the leaves (30 tons) to collapse the "V". On the date in question, the gates could not be lowered in their normal fashion and thus the upstream water rose to such a level that the river sought a new channel around the dam, and in so doing, washed out the foundation for plaintiffs' tracks. The washout was not an insignificant occurrence, but, rather, an emergency of substantial magnitude. The particulars of the washout merit recapitulation.

On June 25, 1968, the Ann Arbor area was deluged with 4.74 inches of rain, most of which fell in a 12-hour period. This was the greatest 24-hour (or 12-hour) rainfall in the Ann Arbor area since daily rainfall records were first kept in 1888. This record rainfall not only exceeded the prior record (3.70 inches on April 4, 1947) by more than one inch, but fell on a day in June when heavy rains are not expected.

Such a rainfall was unforeseeable by anyone, including meteorologists, and was unprecedented in intensity and magnitude. At around 5:15 in the afternoon of June 25, 1968, when the monitoring panel at the Water Treatment Plant showed the level of Geddes Pond to begin to rise above "full pond", or an elevation of 747.87 feet above sea level, which was the level historically maintained by both the Detroit Edison Company and the City of Ann Arbor, a two-man crew was dispatched to Geddes Dam. When these men arrived at about 5:30 P.M., they found they were completely unable to lower the bear-trap gates. They then directed their labors to keeping trash and flotsam from plugging the openings to the wicket gates. Other men were sent to the other three dams as the river began to rise rapidly late in the afternoon and early in the evening of the 25th. The testimony of the City employees, as documented by the defendant's exhibits, chronicles arduous efforts by many men over long hours and even days without sleep: Efforts to "iron out the flood" by keeping the wood crest gates at Barton and Argo dams in the full up positions to hold back the upstream waters; the physical shoveling of dirt onto the Barton embankment to stop the overtopping of that earthen dam; repeated efforts to lower the Geddes bear-trap gates until the entire Geddes Dam was overtopped, making further access to the gate controls impossible, and the emergency efforts city-wide to deal with the crisis.

When the washout occurred, at about midnight on the 25th of June, City employees were still on the job at the Geddes Dam and, once the headwaters began to subside, renewed attempts were made to lower the bear-trap gates. These efforts were continued without success throughout the day of the 26th. In fact, the former operator of the dams for the Detroit Edison Company, a Mr. Garner, was brought to the dam site, and his attempts to lower the gates resulted in one of the gates going up six inches more and staying there. City personnel considered

the use of dynamite and a bazooka to blast the gates down, so firm were the gates in the upright position. As the tailwaters went down on the night of the 26th and early in the morning of the 27th, the north bear-trap gate went down of its own accord. Again, during the day of the 27th, the City employees tried a variety of methods to lower the south gate; including spreading visqueen (sheet plastic) down the face of the upstream leaf, inserting a jack between the gate and the concrete walkway above the gate, pushing down on the gate with a back hoe, and finally, cutting holes in the downstream leaf with an acetylene torch and then successfully pushing the gate down with a back hoe. The foregoing aptly demonstrates that the failure of the gates to operate was not the result of a lack of effort by the defendant. Plaintiffs, however, contend that liability exists as a result of the defendant's failure to properly maintain the gates. It was this issue which consumed the bulk of plaintiffs' proofs at trial.

The design of the gates incorporates seals along both edges of each leaf, which wipe against the walls of the gate. If the seals on the upstream leaf are allowed to deteriorate, as defendant contends was the case, the gates will not operate properly. Plaintiffs offered no direct testimony as to the deterioration or absence of the upstream seals on the day of the washout. Much of plaintiffs' case was presented by its expert, Mr. Robert Norris, who testified that the deterioration of the seals was the only plausible explanation for the failure of the gates to operate properly. This testimony was based upon a knowledge of the design, construction, and theory of operation of the bear-trap gates. The only positive testimony relating to the absence of seals is based upon the August, 1968 inspection of Leonard VanZant, approximately two months after the date of the washout. On the other hand, employees of the defendant testified that the north gate had been fully lowered the very morning of the washout in order to pass trash over the dam. The operator of the dam also

inspected the gates shortly after the washout, and testified that they were in place and in good condition. In an effort to demonstrate alternative explanations for the gate malfunction, the defendant introduced evidence that (1) the discharge pipe under each bear-trap gate was designed too small to handle heavy flows; (2) the bear-trap gates were designed with inadequate "venting", and that, after the flood, Mr. Eberhardt suggested the installation of vanes or "splitters" on the identical bear-trap gate at Superior Dam, and when this design modification was performed, the gate worked better than it ever had before; (3) the walls within which the Geddes gates moved were constructed out of plumb, so as to cause binding on the gates; (4) the railroad bridges downstream were so designed and built as to "choke off" the river flow and cause high tailwater at the Geddes Dam, and the high tailwater condition prevented the lowering of the gates.

The Court feels that any of the design, construction, or maintenance defects as advanced by either party could explain the failure of the gates to operate normally at the time of the 1968 flood, but there was no conclusive proof as to the cause or causes of the malfunction. Moreover, whatever the reason for the gates not lowering, it was not proved that the City of Ann Arbor was in any way negligent. For the reasons discussed below, this failure of proof is fatal.

Plaintiffs' Complaint alleges trespass and nuisance. According to Prosser, there are three theories of liability for trespass and nuisance actions: (a) strict liability; (b) intentional trespass or nuisance; or (c) negligent trespass or nuisance. Prosser, Torts, 4th Ed., 64, 65, 574, 575.

The strict liability doctrine of Rylands v. Fletcher, L.R. 3 H.L. 330 (1868), historically has been narrowly confined to cases where man-made bodies of water have been located in unnatural areas (i. e., outside of a natural river or stream bed), and, more significantly, strict liability has not found approval in Michi-

gan. See, e. g., McHenry v. Ford Motor Co., 146 F.Supp. 896, 903 (E.D.Mich. 1956).

■ One is liable for intentional trespass if he intentionally causes a thing or substance to enter land in the possession of another. Such would be the case where one erects a dam across a stream, thereby intentionally causing the water to back up and flood the land of an upper riparian owner. Restatement, Second, Torts § 158 (Comment). Intentional trespass also occurs when a dam owner intentionally releases water without any regard for the rights of the proprietors below, Rockford Paper Mills, Inc. v. City of Rockford, 311 Mich. 100, 105, 18 N.W. 2d 379 (1945); or when a city constructs a sewer which discharges onto the land of another, Ashley v. City of Port Huron, 35 Mich. 296 (1877).

Where the elements of intentional trespass or nuisance are absent, the standard of liability in cases of flood damage has been articulated as follows:

> "To hold them [defendants] responsible, there must be some negligence or some intention on their part to suddenly release impounded waters so that damage * * * will follow. They cannot be held responsible for a superfluity of waters coming from a flood condition arising above their dam without any negligent act on their part." Rockford Paper Mills, Inc. v. City of Rockford, 311 Mich. 100, 106, 18 N.W.2d 379, 382 (1945).

■ The Michigan Supreme Court, in the *Rockford Paper Mills* decision, also reiterated its approval of the jury instructions found in Taylor v. Indiana & Michigan Elec. Co., 184 Mich. 578, 585, 151 N.W. 739 (1915):

> "In addition [plaintiff] must show, not only that he received an injury . . ., but that the defendant, through some willful and negligent act which a prudent man would not have done, caused the injury to the plaintiff * * *." 311 Mich. at 106, 18 N.W. 2d at 382.

Suffice it to say that, regardless of the theory upon which liability is argued, the plaintiffs herein have not sustained their burden of proof. There has been no sufficient showing of either an intentional or negligent act or omission, the natural consequence of which was the flooding of plaintiffs' property.

■ A similar fate must befall defendant's counterclaim. The counterclaim is based upon the fact that there are two railroad bridges on the Huron River downstream of the Geddes Dam, and that said bridges were designed, constructed, inspected, and maintained by said plaintiffs in a negligent manner, in that they unreasonably impeded the flow of water in the Huron River. It is contended that the bridges obstructed the flow, and caused the upstream water to rise to such a level that defendant's property was flooded. Defendant's significant evidence consisted of a showing that at certain high river flow rates, the bridges increased the level of the waters upstream of the bridges. The more credible proof, however, tends to establish that the flow rate of the river was not of the magnitude required for the railroad bridges to significantly affect water levels. There was no proof of a causal relationship between the presence of the railroad bridges and the flooding of defendant's property. Additionally, there was no evidence of negligence in the design, construction, inspection, or maintenance of the bridges. Notwithstanding the evidence that, at high river flow rates, the bridges impeded the river flow, there was no credible evidence to the effect that the impediment was an unreasonable one.

Therefore, it is ordered that a Judgment of No Cause for Action be entered against plaintiffs on their claim, and a Judgment of No Cause for Action be entered against defendant on its counterclaim.