**KEY SALES COMPANY, Plaintiff,**

v.

**SOUTH CAROLINA ELECTRIC AND GAS COMPANY, Defendant.**

**Civ. A. No. 66-375.**

United States District Court
D. South Carolina,
Columbia Division.

Aug. 29, 1968.

Julius W. McKay, McKay, McKay, Black & Walker, Columbia, S. C., for plaintiff.

Harold W. Jacobs, Frank B. Gary, Wiburn R. Brewer, Jr., Cooper, Gary, Nexsen & Pruet, Charles W. Knowlton, Boyd, Bruton, Knowlton & Tate, Columbia, S. C., for defendant.

## ORDER

SIMONS, District Judge.

This action was commenced by plaintiff, a North Carolina Corporation, against defendant seeking damages allegedly suffered as a result of the flooding of plaintiff's property by waters released from defendant's hydro-electric dam on June 15 and 16, 1965.

In its first cause of action based upon negligence plaintiff alleges a breach of duty on the part of defendant in the maintenance and operation of its hydro-electric facility at Lake Murray Dam and reservoir, by its failure to anticipate the oncoming flood waters and to reduce its pond level sufficiently to accommodate them. In its second cause of action, plaintiff alleges that, even in the absence of negligence or wrongdoing on defendant's part, the latter's erection and operation of its dam was the proximate cause of plaintiff's loss and damage, which would not have occurred had the dam not been in existence. In its third cause of action plaintiff alleges a taking of its property without compensation within the meaning of the South Carolina Constitution, on the theory of a continuing trespass. As a fourth cause of action plaintiff seeks damages to its property resulting from defendant's wrongful trespass thereon and seeks to enjoin defendant from continued future trespasses which will cause irreparable damages to plaintiff's property.

Plaintiff asserts that during the critical period of June 8–15, 1965 defendant collected a full head of water in its Lake Murray Reservoir, allowing the lake level to exceed its license limit of 360 feet above sea level; that it was negligent in the operation of its facility by such impoundment of the water, and by then releasing it in large and uncontrollable quantities into the Saluda River basin below its dam when it knew or reasonably should have known that such quantities of water would flood plaintiff's Pineglen residential subdivision and destroy its use as a real estate development.

Defendant's answer sets up as defenses: (1) A general denial, (2) Act of God, (3) release of liability for flooding of plaintiff's land by virtue of a release granted to defendant for the land in question by plaintiff's predecessor in title, (4) contributory negligence, and (5) assumption of risk. Defendant denies that it discharged any more water than it received into its reservoir, and

asserts that plaintiff's property would have been flooded on June 13–14, and June 15–16, 1965, even if defendant's dam had not been in existence. It specifically denies any negligence or wrongdoing on its part, and contends that it used due diligence and accepted operating precedures in the maintenance and operation of its hydro-electric plant and reservoir.

The cause was tried before the court without a jury during the week of April 15, 1968. The issues for determination are: (1) Was defendant negligent in the operation of its dam during the period of June 8 through June 16, 1965; and if so, was such negligence the proximate cause of the plaintiff's damages. (2) Did the conduct of defendant during this period in casting flood waters over the lands of plaintiff amount to an unconstitutional taking or a wilful trespass for which plaintiff is entitled to recover damages, and should defendant be enjoined from continued future trespasses. (3) If defendant were negligent, was plaintiff contributorily negligent so as to bar its recovery for defendant's negligence. (4) Was the flooding of plaintiff's land the sole result of an Act of God so as to relieve defendant of all responsibility therefor. (5) Did defendant's purchase of a portion of the tract of land from a predecessor in title of plaintiff's property to accommodate waters discharged from defendant's Saluda dam constitute a release of liability of defendant for future flooding of the remainder of the tract, including plaintiff's subdivision. (6) What amount of damages, if any, has plaintiff proximately suffered by reason of the flooding of its property by defendant.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff is a North Carolina corporation and for many years has been in the business of purchasing land for development of residential subdivisions.

2. Defendant is a corporation created by an act of the General Assembly of South Carolina, and is engaged in the generation of electricity for sale to the public. Under South Carolina statute and the license granted it by the Federal Power Commission it was authorized to erect a dam on the Saluda River for such purpose.

3. At all times in question Lake Murray was owned and operated by defendant under license of the Federal Power Commission designated as Project No. 516. Article 14 of the license of the Federal Power Commission provides:

> "The United States specifically retains and safeguards the right to use water in such amount, to be determined by the Secretary of War, as may be necessary for the purposes of navigation and the operation of the licensee so far as they affect the use, storage and discharge from storage of waters affected by this license, shall at all times be controlled by such reasonable rules and regulations as the Secretary of War may prescribe in the interest of navigation and as the Federal Power Commission may prescribe in the interest of flood control and of the fullest practicable use of the said water for power purposes."

Article 32 of the license provides:

> "The licensee shall operate the spillway at Saluda Dam in accordance with the accepted operating practices up to its full controllable capacity, so that the water surface elevation shall not exceed 360 feet. In case the water surface elevation exceeds 360 feet, the licensee shall continue to utilize the full controllable capacity of the spillway until the water surface elevation has receded to 360 feet."

4. The defendant acquired its rights in and around Lake Murray for the primary purpose of electrical generation and operated the dam for this primary purpose. The Saluda Dam impounds the waters of the Saluda River water shed which forms Lake Murray. The lake covers approximately 50,000 acres or 78 square miles, and has a storage capacity of 750 billion gallons or 100 billion cubic feet of water. The Saluda River water shed covers approximately 2,420 square miles. This area can be generally subdivided into three sections: (1) The northernmost 1,150 square mile area which drains through Lake Greenwood, a man-made lake with a controlled outflow; (2) A 470 square mile area which drains into the section of the Saluda River extending from the Greenwood Dam to Silverstreet where a United States Geological Survey automatically recording river gauge is located; (3) the remaining 800 square mile area of watershed drains into the Saluda River below Silverstreet or directly into Lake Murray, and is not metered by a river gauge. The waters of Lake Murray are used to turn turbines in the defendant's hydro plant to produce electrical energy, and water discharged through these turbines is passed downstream. Water is money to the defendant, for it is through the use of this water that the defendant produces the electricity which it in turn sells to customers. Naturally defendant attempts to conserve as much water as possible.

5. Since the construction of a steam generating plant located at the Saluda Dam site, the Saluda Hydro-Plant is generally used as a "peaking plant" to meet electricity demands during different times of the day. Generally its peak periods or peak demand times are approximately 10:00 o'clock in the morning and 8:00 o'clock in the evening. Accordingly, during this time or at other times of peak demand defendant uses its water supply to turn the turbines in producing electrical energy. At other times of the day its base load is supplied by its steam generating plant. During construction of the Saluda Dam four turbine generator units were installed which, when operating at full capacity, require a discharge downstream of approximately 11,000 cubic feet of water per second. However, defendant had plans to increase its generators to six

and provisions were made to allow a water discharge of approximately 16,500 cubic feet per second. An additional 1,500 cubic feet per second was also included in the plans for discharge capacity, making a total of 18,000 cubic feet per second. In order to accommodate this amount of discharge defendant purchased or condemned property below its dam on both sides of the river to its confluence with the Broad River just above the City of Columbia up to a contour line of 178 feet above sea level. Any discharge over 18,000 cubic feet per second exceeds defendant's flowage rights and results in flooding downstream. Included with other property purchased by the defendant for this purpose was all land up to the 178th contour line from a tract owned by William H. Freshly. This purchase was made in 1930. The remainder of the Freshly tract was acquired by Michael J. Mungo, in 1963, who in turn sold same to plaintiff for a residential development in 1963 which plaintiff named Pineglen. The total purchase price at that time was $145,000.00. The purchase price was subsequently reduced to $125,233.40 by virtue of a settlement with Mr. Mungo on work that had not been completed at the time of flooding. The development was to include all land improvements, the erection of single family residences, and the sale of the residences to individual owners. The first mortgage financing was to be insured by the Federal Housing Administration.

6. As part of the purchase agreement between Mr. Mungo and plaintiff Mungo was to work out various details including the furnishing of water by the City of Columbia. Prior to completion of the sale to plaintiff, Mr. Mungo had obtained the approval of the plan of the subdivision by the City of Columbia Planning Department and the Federal Housing Administration; the sanitary sewer system had been approved by proper health authorities; and all the engineering except field work had been accomplished.

7. The property was divided into 142 lots, each fronting on a street system, and its sewage disposal system consisted of an oxidation pond constructed for the use of persons who purchased the lots. Prior to June 1965, streets in the area had been constructed and paved, and twenty-four homes developed and sold with the City of Columbia providing water services to each of these homes.

8. The development lies approximately five miles north of the City of Columbia, north and east of Bush River Road between the Broad and Saluda Rivers. The dam of the defendant is located approximately five to six miles upstream from the property in question.

9. Mr. Mungo employed McMillan Engineering Company of Columbia, S. C. to do the engineering work necessary to meet the various requirements of the Federal Housing Administration and commenced negotiations with defendant for electrical service and with the City of Columbia for water service. McMillan's survey of lot layouts, streets, drains, etc., met with the Federal Housing Administration's approval. No attempt, however, was made to determine prior flood history of the land. Mr. McMillan testified during the trial "I was not employed to do a flood study." Thomas G. Barber, vice president of Kavanaugh-Smith which owns plaintiff, testified that no question of flooding was ever brought up. In fact, it appeared throughout the trial that each individual assumed that the other had looked into the flooding aspects. Key Sales apparently relied on the Federal Housing Administration and Mr. Mungo completely in this regard.

10. The work done by Mr. McMillan continued during the negotiations and purchase by plaintiff from Mungo. Before the transaction was consummated plaintiff's staff engineer, Marvin Borum, looked over the site and, although alerted to the fact that the land lay in the flood plain of the Saluda River by examination of a Federal Government topographic map of the area and aware that lands subjected to periodic

flooding was unsuitable for development purposes, made no independent investigation. He was under the impression that McMillan had been retained by Mungo for this purpose and concluded by reason of the Federal Housing Administration's approval that the results of the engineering investigation had been favorable. Mr. Borum testified that he relied on Mungo for flood information because Mungo was to get FHA approval which included flood information. He further stated if it had not been for Mungo he would have checked out the flood history. He further testified that when he saw the topographic map he thought it was in the flood plain of the old river, but yet was not concerned. To the same effect is his written statement dated August 12, 1966.[1]

11. Had an investigation been made of the records of the United States Geological Survey in Columbia, it would have revealed that the Pineglen area was flooded in whole or in part at least fifteen times during the last eighty years as follows: (1) September 1888, (2) August 1908, (3) March 1912, (4) March 1913, (5) October 1918, (6) February 1921, (7) August 1928, (8) March 1929, (9) October 1929, (10) February 1933, (11) April 1936, (12) April 1937, (13) March 1944, (14) April 1946, and (15) May 1949.

12. Defendant's exhibit "C", a report of the United States Department of Interior Geological Survey, shows a river gauge height on June 16, 1965, the date in question, of 13.32 feet and discharge of 53,200 cubic feet per second. Such was exceeded in height on the river gauge on October 2, 1929 with 15.22 feet and again on April 7, 1936 with 14.53 feet. The discharge of 53,200 cubic feet per second on June 16, 1965 was exceeded on August 18, 1928 with 58,200; on March 6, 1929 with 53,600; on October 2, 1929 with 67,000; and on April 7, 1936 with 61,600. Although flood information was readily available, no effective investigation was made prior to Mungo's or plaintiff's purchase of subject property.

13. All arrangements required under Mungo's sales agreement were fully accomplished by him, including the furnishing of water by the City of Columbia to Pineglen Subdivision. However, because of the flooding of plaintiff's lands on June 15, 16, 1965, the City of Columbia refused to furnish water to plaintiff's remaining lots after it became known that the subdivision was located in the flood plain of the Saluda River and was subject to periodic flooding, and when defendant refused to give assurance that additional flooding would not take place in the future. This refusal by the City of Columbia is the basic cause of plaintiff's problems, since without water plaintiff is no longer able to sell its remaining lots. Prior to June 1965, approximately twenty-four houses were constructed, or under construction, all of which were located on the higher portion of the old Freshly tract. Al-

---

1. Defendant's Exhibit "E", is as follows:
"Hollowell, Borum & Associates
"Consulting Engineers & Land Surveyors
1031 Homeland Avenue
Greensboro, N. C. 27405
August 12, 1966
P. O. Box 6161
Telephone 273-0472
"PINEGLEN SUBDIVISION
PRIOR FLOODING STATEMENT
"Prior to the purchase of Pineglen Subdivision, Roger Kavanagh, Mike Mungo, and myself walked the site. The land was flat and Roger asked Mungo if the site was subject to flooding. I said that the presence of pine trees would indicate that the area was not flood land. Mungo agreed with this statement. (However, no more often than flooding has occured, it would be possible to have growth of pines on the site).
"At this time I had not seen the river and although the land was flat, I did not realize that the site was in the flood plain of the river prior to construction of the dam. This was evident after seeing the Geological Survey Map of the area at a later date.
"The land was 'beautiful' and no further check of flooding possibilities was made prior to the purchase.
"s/ Marvin L. Borum
MLB:bm            Marvin L. Borum"

though there had been prior flooding after the construction of the Saluda Dam, this fact was not brought to the attention of plaintiff since it occurred in the lower thickly wooded and undeveloped portion of Pineglen Subdivision. Even as late as April 1964 and June 14, 1965 Pineglen was partially flooded, but this fact was apparently never brought to the attention of plaintiff.

14. Because of heavy rainfall in the drainage area, defendant was forced to commence spilling water through its flood gates, in addition to that being discharged through its turbines, on June 14, 1965. The total outflow reached a peak of approximately 55,000 cubic feet per second during the early morning hours of June 16, which resulted in the flooding of a major portion of plaintiff's subdivision, although doing little or no physical damage. Nevertheless, the flooding did alert the City of Columbia to the fact that the land lay in the flood plain of the Saluda River, and caused the City to refuse to extend its water service to any more of plaintiff's lots. It also resulted in the cancellation of the approval of FHA and VA financing for any new construction in the area. As a result the value of plaintiff's land was downgraded in value from $2500 per building lot to a maximum value of $300 per acre for timber growing or other agricultural purposes.

15. As a guide to the most efficient utilization of its water power, a rule curve was designed by the defendant that recommended pond elevations for each period of the year. (Defendant's Ex. "K"). These elevations were based upon projected rainfall and electrical demands for the various months. The rule curve showed an ideal pond elevation of 358 feet for the month of May with a gradual reduction by hydro-electrical operation down to 350 feet level for the first of December where it remained until January. Its effectiveness is attested to by the fact that prior to the time in question defendant had never spilled any water during the month of June, and there had been a fifteen year span from 1949 to 1964 when no water had been released through its flood gates.

16. David Jeter, defendant's plant operations manager, testified that generally when the elevations of the lake correspond with the rule curve the hydro-electric plant is operated normally, i. e. as a peaking plant; if the elevation is above the rule curve the turbines are operated more, and if the elevation is less they are operated less in order to conserve the water. Defendant is under no strict obligation or duty to follow its rule curve. As a matter of policy it usually does so, although at times the level is allowed to vary slightly since the curve only serves as a guide.

17. The highest elevation on the rule curve is 358 feet above sea level, which leaves two feet of storage space in Lake Murray. Under its Federal Power Commission license, defendant is prohibited from allowing its lake level to exceed a maximum height of 360 feet above sea level, and upon exceeding 360 feet defendant is required to take all possible steps to reduce it as rapidly as possible. Once the lake reaches the maximum height of 360 feet defendant's only course of action is try to match discharge as closely as possible with the inflow. This it did throughout the flood period in question.

18. Due to the nature of the operation of its hydro-electric dam it is extremely important that defendant keep informed of the available weather forecasts in order to anticipate the flow of waters into its reservoir. For this purpose it receives reports from rain gauging stations maintained by the United States Weather Bureau located near the Lake Murray area, and the drainage basin of the Saluda River. It also receives teletype weather information from the United States Weather Bureau. In addition defendant maintains a gauge at the dam and utilizes the practice of paying private individuals a fee to report amounts of rain in excess of one inch at various spots

throughout the watershed. Additionally it receives reports from its employees living or working in the area of any unusual rain at any time. By having the weather information available defendant can adjust the level of its lake, so as to accommodate any inflows that are expected from rains which have fallen within the Saluda River Watershed. Rainfall above Lake Greenwood is of little immediate concern to defendant since runoff therefrom is impounded by Lake Greenwood. Defendant maintains telephone contact with Lake Greenwood in times of spilling, which keeps it informed as to how much water is being released there and will be flowing into Lake Murray a few hours later. Both Lake Greenwood and Lake Murray are able to compute their volume of discharge through knowledge of the number of turbines operating and the degrees to which the spillgates are opened. By the same token the amount of inflow entering into the reservoir can be determined by the rise of the lake level. Thus, from the available information, defendant is able to determine with a high degree of accuracy the amount of inflow into Lake Murray, as well as the outflow.

19. An examination of weather forecasts from the local newspapers and the available reports from the U. S. Weather Bureau in Columbia for the period in question indicates that only normal summertime shower activities were anticipated. Such forecasts did not give any reasonable basis to conclude that sufficient rainfall was expected which would require of defendant anything but normal pond operation, and surely they were not sufficient to warn defendant that flood conditions were ominous. Although a tropical disturbance was reported in the Gulf of Mexico on June 11, which was forecast to have its effect felt in South Carolina on the 12th, it altered its track and was dropped from subsequent forecasts. However, in the reconstruction of its tract from official weather data it appears that the disturbance, after following a zigzag path,

did eventually cross South Carolina. According to defendant's rule curve the level of defendant's lake should have been maintained at approximately 358 feet on the 1st of June and then reduced to 357.7 feet by June 11, 1965. The weather forecasts for June 8 through June 16 indicate nothing unusual, and contain no information reasonably calculated to warn of exceptional rainfall in the area. At 6:00 a. m. on June 8 Lake Murray was at 357.8 feet, which provided storage for an additional 4.718 billion cubic feet of water before reaching the 360 foot maximum. On June 9 Lake Murray's level was 357.9; June 10, 357.9; and June 11, 357.9. As shown by defendant's exhibit "I" there was no significant discharge change occurring at Lake Greenwood, so nothing unusual was expected from there. Lake Greenwood's discharge reading on June 8 was 1407.5 cubic feet per second; June 9, 2,518.3 cubic feet per second; June 10, 2,185.8 cubic feet per second; June 11, 1,377.9 cubic feet per second; June 12, 2,748.7 cubic feet per second; and June 13, 3,635 cubic feet per second. It was not until June 16 that there was a significant change when Lake Greenwood began discharging an average of 12,416.6 cubic feet per second.

20. On June 12 Lake Murray's level rose two-tenths of a foot to 358.10 feet, leaving 4.1 billion cubic feet of storage space in the reservoir. No unusual rains were forecast for the 13th. Discharge through Lake Greenwood's dam and through Silverstreet amounted to nothing unusual. Lake Murray's elevation increased another two-tenths of a foot to 358.30 on the 13th, but there remained capacity in the reservoir for 3.7 billion cubic feet, and two and one-half feet storage was still available in Lake Greenwood. Through the 13th there was no unusual or out of the ordinary weather forecasts, and it should be remembered that the average rainfall for the entire month of June was 3.85 inches. Beginning about midnight the 13th and continuing through the 14th, an extraordinary amount of water com-

menced flowing into Lake Murray, causing its elevation to climb at a rate never before experienced during the history of the dam. The chart[2] set out below, in addition to showing the rapid rise in Lake Murray, also reflects the precision with which defendant was able to maintain its pond at approximately 360 feet, only discharging that amount necessary to maintain this level.

21. As reflected in defendant's exhibit "I" only 3,635.0 cubic feet per second of inflow on the 13th came from Lake Greenwood, which required from 12–18 hours to reach Lake Murray. Silverstreet was passing 5,000 cubic feet per second, so anything additional came from the watershed below Silverstreet. Approximately 110,000 cubic feet per second was coming into Lake Murray as shown by defendant's exhibit "N", so by deduction is appears that 105,000 cubic feet of inflow originated by rainfall in the area below Silverstreet. At approximately 5:30 a. m. on the 14th David Jeter, defendant's manager, was advised by the dispatcher's office that the level of the lake had risen to about 359.3 feet. He thereupon directed that the hydro plant immediately be put into full operation, which resulted in its coming up to capacity at about 6:00 a. m. on that day. From that moment until days later, after the level of the lake had receded, the plant continued

2. The following is a chart of elevation taken from PX 26 showing Lake Murray pond elevations for June 7 through 16:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| June | 7 | 12:00 p.m. | 357.7 | June 15 | 10:00 p.m. | 360.00 |
| " | 8 | 12:00 p.m. | 357.9 | " " | 11:00 a.m. | 360.00 |
| " | 9 | 12:00 p.m. | 357.9 | " " | 12:00 a.m. | 360.00 |
| " | 10 | 12:00 p.m. | 357.9 | " " | 1:00 p.m. | 360.00 |
| " | 11 | 12:00 p.m. | 357.9 | " " | 2:00 p.m. | 360.00 |
| " | 12 | 12:00 p.m. | 358.1 | " " | 3:00 p.m. | 360.00 |
| " | 13 | 12:00 p.m. | 358.3 | " " | 4:00 p.m. | 360.00 |
| " | 14 | 1:00 a.m. | 358.4 | " " | 5:00 p.m. | 360.00 |
| " | " | 2:00 a.m. | 358.6 | " " | 6:00 p.m. | 360.00 |
| " | " | 3:00 a.m. | 358.8 | " " | 7:00 p.m. | 360.00 |
| " | " | 4:00 a.m. | 359.0 | " " | 8:00 p.m. | 360.00 |
| " | " | 5:00 a.m. | 359.1 | " " | 9:00 p.m. | 360.00 |
| " | " | 6:00 a.m. | 359.35 | " " | 10:00 a.m. | 360.00 |
| " | " | 7:00 a.m. | 359.4 | " " | 11:00 p.m. | 360.00 |
| " | " | 8:00 a.m. | 359.47 | " " | 12:00 p.m. | 360.00 |
| " | " | 9:00 a.m. | 359.52 | " 16 | 1:00 a.m. | 360.031 |
| " | " | 10.00 a.m. | 359.52 | " " | 2:00 a.m. | 360.032 |
| " | " | 11:00 a.m. | 359.52 | " " | 3:00 a.m. | 360.035 |
| " | " | 12:00 a.m. | 359.63 | " " | 4:00 a.m. | 360.022 |
| " | " | 1:00 p.m. | 359.67 | " " | 5:00 a.m. | 360.01 |
| " | " | 2:00 p.m. | 359.70 | " " | 6:00 a.m. | 359.99 |
| " | " | 3:00 p.m. | 359.73 | " " | 7:00 a.m. | 359.965 |
| " | " | 4:00 p.m. | 359.75 | " " | 8:00 a.m. | 359.950 |
| " | " | 5:00 p.m. | 359.75 | " " | 9:00 a.m. | 359.940 |
| " | " | 6:00 p.m. | 359.93 | " " | 10:00 a.m. | 359.940 |
| " | " | 7:00 p.m. | 359.98 | " " | 11:00 a.m. | 359.940 |
| " | " | 8:00 p.m. | 359.98 | " " | 12:00 a.m. | 359.94 |
| " | " | 9:00 p.m. | 359.99 | " " | 1:00 p.m. | 359.94 |
| " | " | 10:00 p.m. | 359.99 | " " | 2:00 p.m. | 359.94 |
| " | " | 11:00 p.m. | 359.95 | " " | 3:00 p.m. | 359.95 |
| " | " | 12:00 p.m. | 359.93 | " " | 4:00 p.m. | 359.95 |
| " | 15 | 1:00 a.m. | 360.01 | " " | 5:00 p.m. | 359.95 |
| " | " | 2:00 a.m. | 359.99 | " " | 6:00 p.m. | 359.96 |
| " | " | 3:00 a.m. | 359.98 | " " | 7:00 p.m. | 359.97 |
| " | " | 4:00 a.m. | 359.99 | " " | 8:00 p.m. | 359.97 |
| " | " | 5:00 a.m. | 359.98 | " " | 9:00 p.m. | 359.97 |
| " | " | 6:00 a.m. | 359.99 | " " | 10:00 p.m. | 359.98 |
| " | " | 7:00 a.m. | 359.99 | " " | 11:00 p.m. | 359.98 |
| " | " | 8:00 a.m. | 360.00 | " " | 12:00 p.m. | 359.98 |
| " | " | 9:00 a.m. | 360.00 | | | |

to operate at full capacity discharging water at the rate of approximately 11,000 cubic feet per second. In spite of maximum continuous discharge through the turbines of the hydro plant, the lake level continued to rise and by mid-afternoon of the 14th it became evident that spilling through the spillway gates would be necessary to prevent the elevation from exceeding the 360 foot mark. Consequently at approximately 5:30 p. m. on the 14th the first of its flood gates was opened. From that time until around noon on the 18th the gates were opened in varying amounts in an attempt to match outflow with inflow, so as to maintain pond elevation within the Federal Power Commission limitation of 360 feet. The total discharge peaked at about 38,000 cubic feet per second during the night of the 14th, and as inflow receded gate openings were adjusted to decrease discharge to 18,000 cubic feet per second from about 5:00 a. m. until about 1:00 p. m. on the 15th. Thereafter a general rain from the unpredicted tropical disturbance moving out of the Gulf of Mexico drenched the area with an extraordinary, and unforecast, amount of rain, which started another tremendous inflow of water into the lake. It was this second inflow that resulted in the peak discharge on the morning of the 16th of approximately 55,000 cubic feet of water per second, and by 4:30 a. m. on June 16, the water on Pineglen had reached its peak at contour 186 feet.

22. Had the defendant at midnight on June 13th commenced full hydro operation and continued to use its flood gates sufficiently to release a total of 18,000 cubic feet per second so as to fully utilize its downstream flowage rights, still it could not have prevented the peak flow of 55,000 cubic feet per second discharge on the morning of the 16th. Under such circumstance before midnight of the 15th the lake level would still have reached 360 feet maximum in spite of the fact that it had continuously discharged 18,000 cubic feet commencing at midnight on the 13th. Defendant would then have been forced to match outflow with inflow thereafter, which would have necessitated its releasing the 55,000 cubic feet per second inflow which occurred during the morning hours of the 16th.

23. Throughout the entire spilling operation after the level of the lake reached 360 feet, and while inflow exceeded 18,000 cubic feet per second, defendant did not permit the lake's elevation to vary more than $7/10$ of an inch in spite of tremendous and varying inflows of water. To accomplish this constant calculations and gate adjustments were necessary. To adjust gate openings to match outflow with inflow, it is essential that a trend in elevation first be established. After this is done gates are adjusted accordingly. This requirement of establishing a trend before being able to make gate adjustments results in an inherent time lag between inflow and outflow. On a rising pond on an instantaneous basis, inflow of necessity exceeds outflow, and on a falling pond outflow exceeds inflow. While there is a differential present between inflow and outflow at any given instant that pond elevation is changing, in a well managed spill operation the total amount of water entering the lake is matched very closely to the total amount discharged, and there is no aggravation of downstream flooding over what would have been experienced in the absence of the dam. The lag merely results in the retention of peak flows for an interval of time before they are released downstream, changing only the time that the water reaches a certain downstream spot, and not the amount that reaches there. This is what happened during the flood period in question, as evidenced by defendant's Exhibit "N". The peak discharge of 55,000 cubic feet per second at 4:30 a. m. on the 16th was the result of the peak inflow of the same amount at 3:00 a. m. that date.

24. The release of this 55,000 cubic feet per second discharge downstream on the 16th was really the result of two separate and distinct occurrences. The

first was the tremendous inflow which commenced at about midnight of the 13th and continued into the morning of the 14th, peaking at a rate in excess of 110,000 cubic feet per second. By 7:00 p. m. on the 14th, the 3.7 billion cubic feet of excess storage above the 358.30 foot level of the lake available just before midnight of the 13th was filled despite the spilling of 470 million cubic feet of water by turbine and spillway gate operation. The second was the general rain from the tropical disturbance which commenced on the 15th and resulted in a peak 55,000 cubic foot per second inflow, all of which had to be discharged because the 13th–14th flood had filled the lake to the 360 foot elevation. The lake rise of the 14th was unanticipated and was the result of a freak rain of such proportion that its probability of occurrence would be less than once in a hundred years. This brought about the extraordinary inflow of in excess of 110,000 cubic feet per second of water into the lake during the early morning hours. By deduction this shower must have fallen directly on the lake, and its immediate environs, and must have averaged 4.9 inches over a 117 square mile area in the twelve hour period from just before midnight on the 13th until just before noon of the 14th. During this period ·3.08 billion cubic feet of water entered the lake. Of this amount 0.37 billion cubic feet was accounted for by river flow through the Silverstreet gauge, which metered the runoff from 1620 square miles of the 2420 square mile total drainage area of the Saluda watershed. The remaining 2.71 billion cubic feet, therefore, can only be accounted for by runoff from the 800 square mile area that drains into the river or lake from below the Silverstreet gauge.

25. The five official rainfall stations situated in this 800 square mile area, or close enough thereto that rains experienced there would be representative of those falling in the drainage area, averaged 1.72 inches during the twelve hour period. Since the five official sta-

tions are spaced roughly equi-distant apart in a semi-circle extending around the lake along the periphery of the area from southwest of the dam clockwise to northeast thereof, and all are 10 to 20 miles from the lake or the Saluda River, it appears that most of the land area surrounding the lake probably received an average rainfall of this amount. The size of the land area involved is the 800 square mile drainage area, less 117 square miles comprising an egg shaped area encompassing the lake and the land area between the bays which extend inland from the main body of water. This 683 square mile land area, if subjected to the average 1.72 inch rainfall, would have received 2.74 billion cubic feet of water during the twelve hour period. Of this amount 50%, or 1.37 billion cubic feet of water is accounted for by river flow through Silverstreet, and runoff from the 683 square miles surrounding the outer boundary of the water and encompassed land areas. The remaining 1.34 billion cubic feet of water must be accounted for from rain falling directly on the 117 square mile lake and land area.

26. The percentage of runoff therein would be less than 100% because of the land lying within its boundaries. Nevertheless, because of the large percentage of water area and the close proximity of its land area to the water, assignment of a 100% runoff factor to rain falling in the area should produce a reasonable, although conservative, estimate of the actual rainfall experienced during the time in question. This runoff would require an average rain of 4.9 inches over the 117 square miles during the twelve hour period to produce the 1.34 billion cubic feet of water not supplied by the Saluda River through Silverstreet and the runoff from the remaining 683 square miles of the lower drainage area. Such a rainfall, according to the official United States Weather Bureau statistics, has an average occurrence probability of once in a hundred years in the Columbia area. It is obvious that a steady rain of this intensity

did not fall on the lake area during the period in question. This is evidenced by the fact that defendant's private rainfall gauge at the dam only recorded slightly over 2 inches for the entire 24 hour period of the 14th. The rain was of shower type, being much more severe in some spots than in others. Mr. Purvis, the meteorologist of the Columbia U. S. Weather Bureau, testified that he was of the opinion that shower activity was of such intensity that 8 to 10 inches of rain fell at some isolated spots on the lake during this period. Again, according to the probabilities for the area, this would be a once in a hundred year occurrence.

27. Had defendant's lake not been in existence the peak of 110,000 cubic feet per second flow of water experienced on the morning of the 14th would undoubtedly have been reduced. The expert's opinions varied from a peak of less than 22,000 cubic feet per second flow by plaintiff's witness Mr. Sinclair, to peak flows of 60,000, 75,000 and 80,000 cubic feet per second respectively by defendant's experts Saville, Jeter and Johnson. It is obvious that the precise peak flow which would have occurred in the absence of the dam is indeterminable because of the rainfall pattern possibilities that exist. The amount the peak would have been reduced had the lake not been present is directly related to the rainfall distribution in the area. If all of the rain had fallen on the periphery of the drainage area, the size of the peak would have been hardly affected. It is known that 3.08 billion cubic feet of water entered the lake during the period in question. It is also known that 0.37 billion cubic feet of this amount entered through the Silverstreet gauge. 2.71 billion cubic feet, therefore, has to be accounted for by the 800 square mile area that drains into the river and lake from below Silverstreet.

28. Had defendant's dam not been in existence and no part of the 110,000 cubic feet per second inflow during the late hours of June 13 and the early hours of June 14 could have been stored, plaintiff's subdivision would have been flooded at least to the same extent, and probably much more, taking into account the undisputed 50% runoff factor agreed upon by the experts, instead of the 38,000 cubic feet per second that it actually received on the 14th. In reality the area of plaintiff's subdivision which was flooded was reduced to a substantial extent by defendant's storage of the rainfall that fell from midnight of the 13th through the early morning of the 14th. It necessarily follows that had defendant's dam never been built and had Lake Murray not been in existence, then of the 110,000 cubic feet per second inflow that occurred on the night of the 13th and early 14th, no less than 55,000 cubic feet per second would have reached Pineglen Subdivision during the early hours of June 14. Any amount of flowage in the Saluda River at Pineglen in excess of 18,000 cubic feet per second was sufficient to raise the water above the 178 foot contour and flood plaintiff's property. Without the effect of the storage of the rainfall in Lake Murray, Pineglen would have been flooded during the early morning of the 14th to a greater extent than it was, because on that morning only 38,000 cubic feet was discharged by defendant while it had an inflow of 110,000 cubic feet per second.

29. Had defendant's dam not been in existence on the 16th, the inflow of 55,000 cubic feet per second on that date, reduced by an estimated runoff factor of 50%, would have resulted in a 27,500 cubic feet per second flowage down the Saluda River past plaintiff's property. This amount would have flooded Pineglen to some extent on that date, but not to the extent that it was actually flooded by the 55,000 cubic feet per second discharge. Thus, on the 14th, plaintiff had considerably less flooding at Pineglen than it would have had if defendant's dam had not been in existence; while on the 16th it would have had less flooding than it actually did have because of the existence of the dam. In any event, plaintiff's position was no worse because of the presence of the dam.

30. Defendant's exhibit "Q", which is a chart of the monthly inflow into Lake Murray for the months of June from 1930 through 1966, shows that in June 1965 the inflow was approximately 18.8 billion cubic feet of water, an amount exceeding by approximately three times the average inflow for the month of June since 1930. The next highest inflows were in 1934 when it was approximately 14.3 billion cubic feet, and 1932 when it was approximately 6.7 billion cubic feet. Generally in all the other months of June, the inflow has varied between a half billion cubic feet and five billion cubic feet. As verified by a letter from the Federal Power Commission [3] to plaintiff's counsel, defendant owns and operates the pond and dam solely for the purpose of generating electric energy. Under its license and under the common law of this State it has no flood control duties or obligation. It is true, however, that through the years downstream riparian owners have enjoyed significant, though incidental, flood control benefits from defendant's operation of its lake and dam.

31. In some of the newer projects the Federal Power Commission has imposed certain flood control obligations and duties in its licenses. However, defendant's license contains no such provision. Defendant, in the operation of its dam and reservoir, has an obligation to all lower riparian owners not to worsen conditions downstream beyond what would have existed in the absence of the dam. This rainfall causing such a dramatic rise in the lake was most unusual and completely unanticipated. The weather forecasts and rainfall readings gave no indications of same. Defendant had no reasonable basis upon which it could have anticipated such an unusual or extraordinary rainfall, which the U. S. Weather Bureau estimates would occur only once in a hundred year period. Defendant exercised due care in its operations on the occasions in question, and used standard and accepted operating procedures throughout.

32. In this type of case which involves highly technical and specialized facts and information, each party is forced to rely heavily on expert opinion and testimony. The expert opinions in the record are in sharp conflict. Plaintiff's experts opined that defendant failed to use standard and generally accepted operating practices in the operation of its dam and reservoir during this critical period, which supports the premise that defendant failed to use due care and was negligent in its operation, primarily because it failed to use properly the weather information available to it, and it refused to reduce the level of its lake sufficiently and in time to take care of the increase in inflow that the available weather information reasonably warned of.

33. On the other hand defendant's experts and their supporting charts and exhibits strongly refuted any lack of due care or any failure to use to the fullest all available information on the part of defendant. They stoutly maintained that defendant throughout the critical period exercised the highest degree of care, competence, and efficiency in the operation of its dam and lake.

34. After a careful weighing of the testimony and opinions of all the experts, and a consideration of their qualifications, experience, expertise, and particularly the factual bases upon which their opinions are based, the court concludes that the testimony of defendant's

3. Defendant's exhibit "O", a letter from the Secretary of Federal Power Commission in answer to an inquiry from S. Augustus Black of the law firm of McKay, McKay, Black and Walker, states: "With reference to your further inquiry as to flood control capability of the Lake Murray Reservoir of Project No. 516, it should be observed that this project was designed and is operated for the purpose of hydro electric power production. While at certain times it affects flood flows to some extent, such flood control is incidental to the operation of the project for power purposes."

experts is more worthy of weight[4] and more credible than those of plaintiff.

## CONCLUSIONS OF LAW

The court has jurisdiction of the parties and of the subject matter in suit based upon diversity of citizenship between plaintiff, a North Carolina Corporation, and defendant, a South Carolina Corporation, and the amount in controversy.

Inasmuch as plaintiff's alleged cause of action arose from occurrences within this State the laws of the State of South Carolina apply to the issues herein.

The following statutes and constitutional provisions are relevant to the issues in this case:

(a) Section 18–5 of the 1962 Code of Laws of South Carolina provides that:

"No person shall be permitted or allowed to make or keep up any dam or bank to stop the course of any waters so as to overflow the lands of another person without the consent of such person first had and obtained nor shall any person be permitted or allowed to let off any reserved water to injure the crops upon the grounds of other persons."

(b) Article 1, Section 17 of the Constitution of the State of South Carolina provides in part as follows:

" * * * Private property shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made therefor."

(c) Title 16, Section 803(c) of the United States Code Annotated provides as follows:

"That the licensee shall maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, shall make all necessary renewals and replacements, shall establish and maintain adequate depreciation reserves for such purposes, shall so maintain and operate said works as not to impair navigation, and shall conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property. Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor."

Plaintiff's complaint sets forth essentially two causes of action in the alternative. The first cause of action is predicated upon negligence in the maintenance and operation of defendant's Saluda Dam and hydro-electric plant. The second cause of action is based upon an alleged unlawful taking as a result of defendant's maintenance and operation of its dam and the discharge of waters therefrom resulting in trespasses upon plaintiff's property by casting flood waters thereon.

██ Under its license from the Federal Power Commission defendant was authorized and permitted to construct the Saluda Dam and operate its hydro-electric plant for the purpose of generation and sale of electricity, and no duties or obligations were imposed upon it for flood control. Therefore, under its fed-

---

4. For example one of plaintiff's experts, Dan Sinclair, obviously through hindsight came forth with a suggested plan whereby he suggested that defendant should have commenced to discharge 18,000 cubic feet per second on June 11 when its pond level was less than 358 feet and continue to discharge this amount until the inflow subsided on June 17 or 18, although there was absolutely no information contained in the weather reports or forecasts which could have reasonably led one to conclude that any unusually heavy rains were in the offing. It is significant to note that this witness conceded that what defendant did when a full head of 360 feet was reached in the lake was within "accepted operating practices" for its plant.

eral license, or under the statutory or common law, it owed no duty in the operation of its dam and lake to protect plaintiff's property or that of any other riparian owner from flooding.

■ From a reading of Section 18–5 of the 1962 South Carolina Code of Laws, supra, it is clear that the first portion of this section is designed to protect upstream owners from constructive appropriation of property by a dam owner by backing waters upon their lands; and that the latter portion of such section relates to damages of downstream property from the discharge of impounded water. There is no duty imposed by this code section upon defendant to utilize its lake as a catch basin to prevent natural stream flow from passing downstream any less quantity than is received.

■ The last sentence of Title 16, Section 803(c) of the United States Code, Annotated, supra, has been construed by the South Carolina Supreme Court in Rice Hope Plantation v. South Carolina Public Service Commission, 216 S.C. 500, 59 S.E.2d 132 (1958), as not creating a new cause of action, but merely providing that if a legal liability arises against a Federal Power Commission licensee under State law because of damages to the property of others as a result of the construction, maintenance or operation of the licensed project, such liability is the responsibility of the licensee and not the United States. Thus, there is nothing in this federal statute which imposes a duty upon a dam owner to protect downstream property owners by operating its dam and lake for flood control purposes by preventing the natural stream flow from passing downstream. Thus, the *Rice-Hope Plantation* case held that the foregoing federal statute created no new cause of action nor enlarged upon a dam owner's common law liability.

Since neither the state nor federal statutes above quoted nor the license issued by the Federal Power Commission to defendant impose any flood control obligation or responsibility upon it, we must look then to the common law to determine whether it imposes any such obligation upon the defendant under the facts and circumstances of this case.

■ The court concludes that under the applicable common law principles the only obligation imposed upon a dam operator in the operation of his dam is not to worsen conditions downstream beyond what would have occurred in the absence of the dam. Crawford v. Cobbs and Mitchell Co., 121 Or. 628, 253 P. 3, 257 P. 16 (1927); Ireland v. Hennylyn Irr. Dist., 113 Colo. 555, 160 P.2d 364 (1945); 93 C.J.S. Waters Section 38; Rockford Paper Mills, Inc. v. City of Rockford, 311 Mich. 100, 18 N.W.2d 379 (1945).

In DeKalb County v. Tennessee Electric & Power Co., 17 Tenn.App. 343, 67 S.W.2d 555 (1933), an action by plaintiff for damages sustained because of flooding of his property below defendant's dam, the evidence showed that defendant released only so much water as flowed into its reservoir. Plaintiff contended that defendant was negligent in not lowering its pond elevation before the flood waters arrived so that they could have been accommodated without being released to damage plaintiff's property. After noting that there was no showing that defendant should reasonably have anticipated the flood conditions the court stated:

"This action could only be maintained upon the theory of negligence on the part of the power company in manipulating the gates and the dam, for the company had the right to maintain the dam and to permit flood waters to pass through or over it in such quantities as flowed into it."

In Kambish v. Santa Clara Valley Water Conservation District, Cal.App., 8 Cal.Rptr. 215 (1960), plaintiff a lower riparian owner, brought suit for damages sustained to his property by flood waters released from defendant's dam. In the trial court there was a verdict for plaintiff which was reversed on appeal. In reversing, the appellate court noted that the owner of a dam may permit flood

waters to flow over its dam in such quantities as naturally flow into its reservoir and such owner is only under a duty not to worsen the conditions of the downstream owner; and it is under no duty to improve that situation by using its dam for flood control. The court stated:

"The existence of the dam, operated precisely as it was at the time in question, in no way worsened the condition of plaintiff as against what it would have been in the absence of the dam. On the contrary, plaintiff's condition was materially better than if the dam had not existed."

The court in Crawford v. Cobbs and Mitchell Co., supra, summarized well the general principles of the common law relevant to the issues in this case when it stated as follows:

"The following principles of law may be taken as well established: First, as applicable to this case, that the defendant had the right to erect and maintain its dam at the place where it was constructed and to impound the water therein to the full height of the dam; second, that it had, in case of a flood or unusual high water, the right to permit flood waters to pass through or over the dam in such quantities as flowed into it; third, that they had no right, after having impounded the water, to release it in larger quantities than were then flowing into it from above, thereby adding to the normal flow of waters so released by this act in raising the floodgate; fourth, that if, in addition to the normal flow, defendant, by suddenly releasing large quantities of water in addition to the flood water then coming into its dam, caused damage to the plaintiff, either solely by the water so released, or concurrently with the flood water which was going down, it is liable for such damage."

■■■ As to plaintiff's first cause of action based upon negligence in defendant's maintenance and operation of the dam, in order to recover it is incumbent upon plaintiff to prove by the preponderance of the evidence that defendant failed to use due care in the operation of its dam and reservoir which proximately caused the alleged damages sustained by plaintiff. Taylor v. Lexington Water and Power Co., 165 S.C. 120, 163 S.E. 137 (1932). As was stated in the case of Bruton v. Carolina Power and Light Co., 217 N.C. 1, 6 S.E.2d 822 (1940):

"An actionable injury arises when the consequence of the detention of water by a dam is the flooding of the lands of owners either upstream or downstream. However, the owner of a dam may permit water to flow from a dam if the waters coming to the dam are neither accelerated in speed or increased in quantity, so long as ordinary care is exercised in the discharging of the water ponded behind the dam. Nothing appears to be more settled than that the owner of a dam is not bound to anticipate unprecedented storms or rainfalls, and is not liable for damages resulting from extraordinary storms and floods. But where the negligence of the defendant in the operation of its plant during unprecedented and unforeseeable storm or rainfall is a contributing factor in producing injury—that is when the injury resulted from a combination of the defendant's negligence acting in concert with some natural force such as an unprecedented storm the defendant is not relieved from liability, since an act of God which exculpates the owner of a dam must be such an act as constitutes the sole cause of the injury.

"Likewise, a defendant power company is required to exercise ordinary care in anticipating flood conditions from an ordinary freshet such as might be reasonably expected or foreseen and to use reasonable care in the manipulation thereof and in guarding against any undue acceleration or retardation of the flood water. It may be held accountable for any damages for its failure to exercise such care. However, in determining whether the

owner of a dam has failed to exercise ordinary care to protect the rights of a lower riparian owner due regard must be had for its correlative duty to protect upper riparian owners against any undue retardation of the flood water. The owner must pay due regard to the rights of the upper, as well as of the lower, riparian owner." (Citations omitted).

In *Bruton* the court directed a verdict for the defendant and held that there was no liability on the part of the dam operator where no more water was passed downstream than came into its pond. See also Baldwin Processing Co. v. Georgia Power Co., 112 Ga.App. 92, 143 S.E. 2d 761 (1965).

A dam owner may rightfully permit flood waters to pass over the dam in such quantities as flow into it. But a limitation on this right is that the water accumulated behind the dam must be discharged with ordinary care, or the owner will be liable for the resulting injuries. 93 C.J.S. Waters § 18. In the present instance defendant did not release any more water downstream than flowed into its lake, and the outflow was released in a careful and prudent manner, as is reflected by the discharge tables showing defendant maintained its dam at 360 feet under very unusual circumstances. Likewise, plaintiff is not entitled to damages if the injury to its property would have occurred even though defendant's structure had not been erected. 93 C.J.S. Waters § 38.

Much of plaintiff's expert testimony was devoted to the premise that the defendant should have anticipated the increased inflow from the available weather information, and should have opened its flood gates sufficient to discharge 18,000 cubic feet per second from June 11 through June 16, so that no more than 18,000 cubic feet per second would have been discharged at any one time during this period. This argument is not per-

suasive since there was no weather information available to defendant during this period which would reasonably put it on notice that it should begin to spill water through its flood gates prior to the time it commenced to do so. Furthermore, such premise is based completely on hindsight, and not reasonable foresight. Moreover, the court has previously found that even in the absence of the dam plaintiff's property would still have been flooded as much or more on this occasion. Plaintiff cannot recover in any event for a "dam owner is not liable where he has not augmented the flow beyond that which would have occurred in the absence of the dam." Kambish v. Santa Clara Valley Water Conservation Dist., Cal.App., 8 Cal.Rptr. 215, 217 (1960).

The plaintiff has failed to carry its burden of proof by the preponderance or greater weight of the evidence to establish that defendant was guilty of any negligent or wrongful conduct in the operation of its dam, reservoir and hydro-electric plant upon the occasion in question. Neither was it negligent in evaluating available weather forecasts and rainfall information as asserted by plaintiff. A study of all weather information available to the defendant immediately prior to and during the critical period fails to present any reasonable basis upon which defendant should have reasonably foreseen that extraordinary and unusual amounts of rainfall were in the offing. Such information and reports only indicated routine thundershower activity for the period. The preponderance of the evidence fully supports the conclusion that throughout the period of June 8 through June 18, 1965 defendant at all times operated its dam and hydro-electric plant in a careful, prudent and highly competent manner, using standard and generally accepted operating procedures. It had no reasonable basis to anticipate any unusual weather conditions or excessive rainfall that

required it to reduce its pond level below its standard operating rule curve.[5]

■ As to plaintiff's second or alternate cause of action based upon alleged unlawful taking of its land as a result of defendant's maintenance and operation of its dam and reservoir and the discharge of waters therefrom, in order for plaintiff to recover it is incumbent upon it to establish by the preponderance of the evidence that there was a "taking" of its property by the wrongful acts of the defendant.

■ The word "taking" has been given a fairly broad construction by the South Carolina Supreme Court, James v. City of Greenville, 227 S.C. 565, 88 S.E.2d 661 (1965), and to deprive an owner of the ordinary professional use and enjoyment of its property is, in law, equivalent to the taking of it. Gasque v. Conway, 194 S.C. 15, 8 S.E.2d 871 (1940).

Plaintiff relies heavily upon Lindsey v. City of Greenville, 247 S.C. 232, 146 S.E.2d 863 (1966), as supporting its position that there has been a "taking" of its property by defendant in violation of Article 1, Section 17 of the Constitution of the State of South Carolina, supra, without paying just compensation therefor. In Lindsey defendant owned and operated a large reservoir on the North Saluda River. A seventy-two inch discharge pipe with an adjustable valve was located at the foot of the dam, through which the flow of water into the downstream river bed could be regulated. There was also a spillway built into the dam to take care of excess flood waters. The spillway discharge emptied into a diversion canal which rejoined the river about four-fifths of a mile downstream.

The plaintiff leased farm land situated on the bank between the dam and the confluence of the diversion canal and the river. He planted a bean crop on the property, which after maturity was destroyed because of flooding of the river brought on by the discharge of water by the defendant through the seventy-two inch pipe.

A heavy rain was experienced which filled the reservoir. At this point the discharge pipe was opened and remained open until the waters subsided some 20 hours later. For a short period the pipe could not accommodate the discharge and water passed over the spillway and down the diversion canal into the river downstream of the plaintiff's property. Water covered plaintiff's crop for some twenty hours.

Defendant contended that it was not liable to plaintiff because the land would have been flooded had the dam and reservoir not existed, and that consequently the reservoir's presence did not worsen the condition on plaintiff's property downstream. The court in upholding the jury verdict noted:

"It is the defendant's position that the evidence conclusively shows that the discharge of waters from its reservoir created no greater volume of flowage below the dam than would have occurred under normal conditions of heavy rainfall without the presence of the dam.

"The testimony shows that the lands upon which plaintiff planted his crops had been subject in the past to overflow from the river in periods of heavy rainfall. Witnesses who lived in the area testified, however, that over a period of forty years flooding had never lasted over two to four hours at any one time; whereas at the time in question, with no greater rainfall than had been previously experienced, flooding continued for a period of approximately 20 hours, ending within about

---

5. If for the sake of discussion, we assume that the defendant was guilty of actionable negligence in the maintenance and operation of the Saluda Dam, the plaintiff was also guilty of contributory negligence which contributed to its damages when it purchased the property without using due care to determine that it was subject to periodic flooding making it totally unfit for residential development.

two hours after the flood gates in defendant's dam were closed. There is also testimony that flooding of the crops for short periods, as in the past, did not result in any appreciable damage, but that prolonged flooding under hot weather conditions, as was the case at the time in question, would result in destruction of the crops.

"We think that it is reasonably inferable from this record that the destruction of plaintiff's crop resulted not from the mere fact of flooding, but directly and proximately from the accumulation of flood waters in the defendant's reservoir and discharging them in such volume and for such time as to cause flooding for a prolonged period beyond that which normally resulted from heavy rains."

From the above it is clear that, rather than imposing an obligation on the upstream dam owner to better the conditions of a downstream landowner by using his facility for flood control, *Lindsey* stands merely for the universally accepted proposition that a pond operator is impressed with a duty not to worsen the condition of downstream property from what would have existed in the absence of the impounded water. Liability was not founded upon the fact that the flood waters were passed downstream, but because the discharge of the flood waters through the pipe retarded the natural flow of the waters and therefore maintained it in a flood stage on the plaintiff's property for a substantially longer period than would have been the case had the water been unimpeded by the dam, thereby drowning out plaintiff's crop.

In Lail v. South Carolina State Hwy. Dept., 244 S.C. 237, 136 S.E.2d 306 (1964), after noting that no case had come to its attention which set forth any comprehensive rule as to the causal connection or relationship between the acts of a public entity and the resulting damages necessary to sustain a recovery except Baynham v. State Hwy. Dept. of S. C., 181 S.C. 435, 187 S.E. 528 which

referred to "the real factor, or at least a participating one" in bringing about the damage, the court held that "the proper test to be here applied as to causal connection is whether or not the damages sustained by plaintiff would have been sustained had it not been for the construction work done by the defendant". *Lail* involved a "taking" by the casting of surface waters upon plaintiff's property. The test in the present case should be the same.

In this case the flooding would have occurred even if the dam had never been built, and this court certainly cannot say that had it not been for the releasing of the waters by defendant that the city of Columbia would not have refused to furnish water anyway.

Plaintiff today still owns precisely what it purchased—lowlands in proximity to the Saluda River subject to periodic flooding. The land was such before its purchase by plaintiff and remains the same today. Plaintiff can only complain of its own insufficient investigation and negligence in purchasing the property without checking into the flooding history. Through its own negligence plaintiff obviously has made a bad bargain, but defendant is not responsible therefor. There has been no "taking" of plaintiff's property by any acts of defendant. Nothing done by the defendant has destroyed or impaired its usefulness, nor deprived the plaintiff of the ordinary beneficial use and enjoyment of its property, so as to constitute a "taking" within the meaning of the South Carolina Constitution.

It is acknowledged that the flooding of plaintiff's Pineglen Subdivision on June 15 and 16 by flood waters which flowed through defendant's lake brought to the attention of the City of Columbia the fact that plaintiff's property lay within the flood plain of the Saluda River and was subject to periodic flooding. However, plaintiff's property had been flooded at least fifteen times over the last hundred years, and on the occasion in question its condition was

not worsened by the presence and operation of defendant's dam. In actuality less water came downstream over plaintiff's property than would have been the case had the dam not been in existence. No physical damage was suffered by plaintiff's property as a result of the flooding. The damages suffered by plaintiff arose solely because the City of Columbia refused to continue to furnish water to Pineglen Subdivision after the flooding brought to the city's attention the fact that plaintiff's property was subject to periodic flooding. Even without the flood of June 15 and 16 it is entirely conceivable that the City, through other independent sources, would have discovered the fact that plaintiff's property was subject to such periodic flooding, and as a result thereof would have refused to extend its water mains farther in plaintiff's subdivision. Thus plaintiff's damages would have been the same. Therefore, the court concludes that plaintiff has failed to establish by the preponderance of the evidence that any acts of the defendant constituted the proximate cause of damages suffered by it. When the City of Columbia refused to furnish more water to plaintiff it was unable to obtain an adequate water supply to the remainder of its subdivision. Consequently it was unable to build any more houses, or sell any more lots. It also lost the benefit of FHA and VA approved financing for the balance of its property. Such damages cannot be said to have resulted proximately from defendant's acts. As the South Carolina Supreme Court stated in Woody v. S. C. Power Company, 202 S.C. 73, 24 S.E.2d 121 (1943):

"[L]iability exists for the natural and probable consequences of negligent acts or omissions, proximately flowing therefrom. * * * The test is to be found in the probable consequences reasonably to be anticipated, and not in the number or exact character of events subsequently arising.

"We have held that when the negligence appears merely to have brought about a condition of affairs, or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate cause, and the former only the indirect or remote cause. * * * The law requires only reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, there is no liability. One is not charged with foreseeing that which is unpredictable or that which could not be expected to happen." (Citations omitted).

In Letterman v. English Mica Company, 249 N.C. 769, 107 S.E.2d 753 (1959), an action was brought against the owner and operator of a mine located upstream from plaintiff's land and against the owner of a dam downstream from plaintiff's land for damages to plaintiff's land and roadways allegedly resulting when dirt dumped into river in the course of upstream mining operations flowed down to the stillwater of the dam, raised the stream bed and caused water to back onto plaintiff's land and roadways. A demurrer was sustained to the complaint, and on appeal the Supreme Court of North Carolina affirmed saying:

" 'As a general rule, the proprietor of a dam which has been lawfully constructed and maintained is not an insurer of the safety thereof, but is required to exercise ordinary care, in the maintenance and operation thereof, to avoid injury to others.' 56 Am. Jur., Waters, Sec. 162, p. 629. 'It may be that when a dam is first built that it will not injuriously affect land some distance from it, and for a long time there will be no cause for them to complain, but when the pond, made by the dam fills with mud, sand, trash, and other things, causes overflows and injury to lands, then the parties injured have a cause of action, if the buildings [sic] and maintenance of the dam is the direct and proximate cause of their injury.' McDaniel v. Greenville-Carolina Power Co., 95 S.C. 268, 78 S.E. 980, 981, 6 A.L.R. 1321,

1323. *But the owner of a dam is not responsible for injuries occasioned by causes which could not reasonably be anticipated or guarded against.* 56 Am.Jur., Waters, Sec. 31, p. 560; Cline v. Baker, 118 N.C. 780, 24 S.E. 516.

"It is our opinion that the plaintiffs have not alleged sufficient facts to show that the ·injuries suffered 'is the immediate result of \* \* \* force originally applied by the defendant' or that any act or omission of English Mica Company is a 'direct and proximate cause of their injury.'" (Emphasis added).

The same appears true in this case. In the first place, the defendant could not have reasonably anticipated the amount of inflow that entered Lake Murray, and secondly, the damages of which plaintiff complains in this case arise solely from the fact that the City of Columbia refused to furnish additional water to the subdivision after gaining knowledge that plaintiff's property was in the flood plain of the Saluda River. There is no sufficient showing under such circumstances that the damages which plaintiff suffered are a direct and proximate result of the flood waters passed downstream through defendant's reservoir on this occasion.

In summary, there has been no proof of negligence on the part of the defendant. To the contrary, the court finds that its operations on the occasion in question were well within generally accepted operating procedures. As to the questions of trespass and an unlawful "taking", plaintiff's subdivision has been subjected to periodic flooding over the years and such flooding has not increased since the erection of the Saluda dam, but to the contrary has decreased. The court has found that in the absence of the dam plaintiff's subdivision would have been flooded anyway, and to now denominate this flooding as a trespass solely because of the presence of the dam and the fact that the waters passed thru defendant's reservoir would be patently injust.

Equally as logical is the fact that plaintiff cannot recover for an "unlawful taking". There can be no such "taking" when defendant did that which it lawfully had the right to do. It is recognized that the waters reaching plaintiff's subdivision passed through defendant's dam, but defendant has no responsibility for flood control. It had the legal right to pass whatever waters entered its lake downstream in such amounts as came in. It had no legal duty to improve plaintiff's potential flood condition, but it was under an obligation not to worsen plaintiff's position, which it did not do. Ireland v. Hennylyn Irr. Dist., 113 Colo. 555, 160 P.2d 364, 365 (1945).

Having concluded that plaintiff's property would have been flooded in the absence of the dam, that there was no "taking", no trespass, and no actionable negligence on defendant's part proximately causing plaintiff's alleged damages, the court finds it unnecessary to discuss defendant's remaining defenses.

Accordingly the plaintiff's complaint is dismissed, and it is so ordered.

Let judgment be entered accordingly.